UNITED STATES of America, Appellee,

v.

Paul CIAMPAGLIA, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

William WOODS, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Peter CANESSA, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

John GINTNER, Defendant, Appellant.

UNITED STATES of America, Appellee,

v.

Verner BANCROFT, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Stanley McNIFF, Defendant,
Appellant, two cases.

Nos. 79-1269 to 79-1272, 79-1274,
79-1391 and 80-1218.

United States Court of Appeals,
First Circuit.

Heard March 12, 1980 (Nos. 79-1269, 79-
1271, 79-1272, 79-1274 and 79-1391).

Submitted March 12, 1980 (Nos. 79-1270).

Heard May 9, 1980 (No. 80-1218).

Decided Aug. 4, 1980.

Certiorari Denied Nov. 3, 1980.
See 101 S.Ct. 365.

Michael F. Natola, Medford, Mass., with whom Alfred Paul Farese, Everett, Mass., was on brief, for defendant, appellant Paul Ciampaglia.

Bernard Grossberg, Boston, Mass., by appointment of the Court, on brief, for defendant, appellant William Woods, and William Woods, on supplementary brief pro se.

David D. Patterson, Boston, Mass., by appointment of the Court, for defendant, appellant Peter Canessa.

Paul A. Manoff, Cambridge, Mass., for defendant, appellant John Gintner.

Albert F. Cullen, Jr., Boston, Mass., by appointment of the Court, for defendant, appellant Verner Bancroft.

Richard K. Donahue, Lowell, Mass., with whom Donahue & Donahue, Lowell, Mass., Margot Botsford, S. Stephen Rosenfeld, and Rosenfeld, Botsford & Krokidas, Boston, Mass., were on brief, for defendant, appellant Stanley McNiff.

George F. Kelly, Asst. U.S. Atty., Springfield, Mass., with whom Edward F. Harrington, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

In January of 1979, after a lengthy investigation, the grand jury returned indictments charging appellants and others with conspiracy to commit mail fraud, 18 U.S.C. § 371, (Count 1) and ten instances of mail fraud, 18 U.S.C. §§ 1341, 1342, (Counts 3–12). Each appellant with the exception of Paul Ciampaglia was also charged with conspiring to conceal the property of a bankrupt, 18 U.S.C. § 152, (Count 2). Appellants were tried together on all of these counts. At the close of the evidence, the trial court entered judgments of acquittal on seven of the mail fraud counts against John Gintner and Verner Bancroft who were not shown to have joined the conspiracy at the time that these seven acts of fraud were perpetrated. On all of the remaining counts, each of the appellants was convicted as charged. These appeals followed and have been consolidated for review.[1]

---

1. Also included in our review of this case is appellant McNiff's appeal from a denial of a motion for a new trial brought during the pendency of this appeal.

In January of 1976 Peter Canessa rented space in a building on High Street in Clinton, Massachusetts, from Stanley McNiff. Beginning in late March and continuing through September, a large number of manufacturers, wholesalers and distributors began receiving orders for merchandise from a firm called Masterson Enterprises [Masterson], which listed the High Street building as its address. The orders were usually signed by Canessa. Most of the companies contacted responded by requesting credit information from references supplied by Masterson. At least some of the references were apparently fictitious, and one was a company operated by appellant Ciampaglia. Canessa and other defendants then arranged to send back false "responses" to the requests, providing fictitious favorable credit information concerning Masterson. Many of the companies with which the orders were placed then forwarded merchandise to Masterson. The merchandise, for which Masterson never paid, was initially stored in a number of Clinton locations owned by McNiff. Most of it was later sold, generally to a company operated by Ciampaglia, at prices substantially less than the wholesale cost.

In October of 1976 an involuntary petition for bankruptcy was filed against Masterson. The company was adjudicated bankrupt on October 11 and a receiver was appointed the next day. As a result of a fire at a building owned by McNiff and rented to Masterson, the receiver was notified by fire department officials of the existence in the building of several filing cabinets that contained legible Masterson records. Before the receiver could obtain the records, however, one of the defendants, Bancroft, removed the cabinets, and the records have never been found.

### I. Sufficiency of the Evidence

Appellants McNiff, Ciampaglia, Gintner, and Bancroft each contend that the evidence was insufficient to support their convictions. Viewing the evidence in the light most favorable to the government, *United States v. Mora*, 598 F.2d 682, 683 (1st Cir. 1979), we reject these contentions. Concerning Gintner, Bancroft, and Ciampaglia, the facts sufficient to support their convictions are set forth in Part VI of this opinion discussing the "willful blindness" instruction.

With regard to McNiff, the pertinent evidence was as follows: (1) He associated with Masterson and its chief operator, Canessa, continually from the commencement of Masterson's operations to the scheme's demise. (2) During this period, he provided for Masterson's use virtually all of the various buildings and trailers used by the conspirators. (3) As payment for providing these locations, he accepted merchandise, the receipt of which, despite the advice of his attorney, he did not record. (4) He claimed that he accepted the merchandise in lieu of normal rent because Masterson was short of cash, yet the evidence showed that he knew Masterson had a substantial amount of cash and generally operated on a "cash only" basis. (5) He failed promptly to disclose to the bankruptcy receiver the existence of a Masterson office trailer which he had received and placed behind a house near his premises. (6) When Masterson records were discovered at a house owned by him, he pretended not to know who owned the building and asked Leo Power "how the hell am I going to get around who rented the house and *what was going on there*?" (emphasis added). (7) He suggested to Canessa that Masterson records, which were never found by the trustee, be moved from the building and he observed Bancroft removing them. (8) He provided a credit reference for Masterson at a local bank. (9) Attempting to conceal his connection to Masterson, he lied to a grand jury, and asked Power to lie also. (10) In a lengthy conversation with Power concerning the grand jury investigation, he indicated knowledge of the conspiracy and a desire to cover it up and to determine who was talking to the investigators.[2]

---

2. The nature of the conversation, which Power tape recorded, is illustrated by the following excerpt:

"LP: But the stuff they're talking about now, Stanley, someone had to feed them all this information, you know what I mean, to come home to roost.

Viewing all of this evidence together, we find it sufficient to have allowed the jury to find McNiff guilty beyond a reasonable doubt. In particular facts 3, 4, 6, 9 and 10, *supra,* were adequate to support a finding of knowledge of the conspiracies. Similarly facts 1, 2, 5 and 7 were adequate to support a finding that, knowing of the conspirators' objectives, McNiff actively assisted them in carrying out the two main conspiracies charged in the indictment. Finally, his knowledge of the aim of the conspiracy together with his own otherwise legitimate business experience supported a reasonable inference that he knew that the mails were to be used in defrauding the various creditors.

## II. Timing of the Petrozziello Ruling

In *United States v. Petrozziello,* 548 F.2d 20 (1st Cir. 1977), we held that district courts should only admit out of court declarations of co-conspirators under Fed.R.Evid. 801(d)(2)(E) if "it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy."

*Id.* at 23. During the trial of this case the prosecution's use of the out of court statements of various defendants as part of its case in chief against all defendants required the district court to apply the *Petrozziello* standard. On the eleventh day of trial, before the defense presented any evidence, the district court found that the prosecution had met the *Petrozziello* standard. The court thereupon removed the limitations that it had previously placed upon the use of the evidence.

Appellant McNiff now contends that because the district court made its ruling before the defense presented any evidence, it could not have properly applied the *Petrozziello* standard. Appellant reasons that *Petrozziello* requires a "preponderance of the evidence" test, *United States v. Martorano,* 557 F.2d 1, 11 (1st Cir. 1977), *reh. denied* 561 F.2d 406 (1st Cir. 1977), *cert. denied,* 435 U.S. 922, 98 S.Ct. 1484, 55 L.Ed.2d 515 (1978); that such a test requires a weighing of all the evidence; and that therefore it is impossible for the district court properly to have applied the test without hearing the defendants' evidence.

> SM: So you think it's much worse than we thought? It looks that way.
> LP: Oh, definitely, definitely.
> SM: No, Marlene and the other one knew, or Marlene knew anyways, one of those girls was there. Hmmm . . .
> LP: What, when the deal was made?
> SM: When they were picked up, there was no money exchanged then you know.
> LP: Because all I told them, is that I bought one . . . So.
> SM: She wouldn't know how I got them but I got them.
> LP: Oh, because, this is what I'm trying to figure out because I asked you before and you didn't give me an answer, you said you didn't remember, you know what I mean?
> SM: What's that?
> LP: When I asked you if you told them because I told them . . .
> SM: No, no I didn't.
> LP: I told them I got one . . . and sent the guarantee in on it, remember?
> LP: And he said, what about the others? Because there was the other ones, remember the one . . .
> SM: But I didn't sell you one, huh? There was no money exchanged between you and I.

> LP: No, you gave them to me, Stanley.
> SM: Huh, whatever, you picked it up, or someone, I didn't know.
> SM: He said they wanted to know where he got it, and he said they asked him if he got it from the 'Panther,' they said did you take anything from the 'Panther?' And he said, you mean the 'Cheetah,' and he said ya, a couple of things from there, which would had me covered because I returned stuff, I took in rent, you know, like the bedroom set, I told them that. But he didn't know anything about a trailer, there was no mention of the trailer.
> SM: But they did mention the trailer? Did they get specific with you on the location of the trailer and everything?
> LP: The trailer, he said, we know for a fact that you got, Bostonian shoes from the trailer behind McNiff's (grand) McNiff's father's, you got office supplies from Squannacook Road.
> SM: Oh, I'm really fucked now. (unintelligible)
> LP: That's what I'm talking about?
> SM: Well, it has to be Karen, who the fuck else would know? Sure."

**638**

Neither in *Petrozziello* itself nor in subsequent cases, *see, e. g., United States v. Martorano, supra; United States v. Pappas*, 611 F.2d 399 (1st Cir. 1979), did we address the issue of when the required "more likely than not" findings are to be made. While it is not irrational to view *Petrozziello* as merely mandating an increase in the required probative force of the prosecution's evidence, *cf. United States v. Trotter* 529 F.2d 806, 812 (3rd Cir. 1976) (adopting substantive standard "more severe than the prima facie standard"), we think that in adopting the "more likely than not", "preponderance" test we implicitly anticipated that the defendant's evidence would be taken into consideration. At least three circuit courts have explicitly adopted such a rule, *see United States v. James*, 590 F.2d 575, 582 (5th Cir.) (en banc), *cert. denied* 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979); *United States v. Bell*, 573 F.2d 1040, 1043 (8th Cir. 1978); *United States v. Stanchich*, 550 F.2d 1294, 1298 (2d Cir. 1977), and we find much merit in it. It is not difficult to imagine a case in which the basic question of whether a conspiracy existed could be greatly or even dispositively affected by the defendant's evidence. To find out of court declarations admissible under Rule 801(d)(2)(E) in such a case after hearing only the prosecution's evidence would render almost meaningless any difference between the standard announced in *Petrozziello* and the prima facie standard that it replaced. Moreover, requiring trial courts to delay *Petrozziello* rulings until the conclusion of all the evidence would not create any significant additional demands or difficulties.

▆▆▆ We therefore hold that trial courts should proceed in accordance with the following rule, which we adopt in partially amended form from the Eighth Circuit

opinion in *United States v. Bell, supra* at 1044:

If the prosecution attempts to introduce into evidence an out-of-court declaration under Fed.R.Evid. 801(d)(2)(E), the trial court, upon proper objection, may conditionally admit the declaration.[3] If the declaration is conditionally admitted, the court should inform the parties on the record out of the hearing of the jury that (a) the prosecution will be required to prove by a preponderance of the evidence that a conspiracy existed, that the declarant and defendant were members of it at the time that the declaration was made, and that the declaration was in furtherance of the conspiracy, (b) that at the close of all the evidence the court will make a final *Petrozziello* determination for the record, out of the hearing of the jury; and, (c) that if the determination is against admitting the declaration, the court will give a cautionary instruction to the jury, or, upon an appropriate motion, declare a mistrial if the instruction will not suffice to cure any prejudice.

▆▆▆ In the instant case, however, neither appellant nor anyone else objected to the timing of the district court's finding. Appellant failed to make any objection setting forth the reasoning that he now persuades us to adopt. Even in the Eighth Circuit, which held two years ago that district courts should make a final preponderance determination at the end of all the evidence, failure to object at trial to the omission of such a determination bars an appellate from raising the point on appeal in the absence of plain error. *United States v. Baykowski*, 615 F.2d 767 (8th Cir. 1980). Our own examination of the record convinces us that there was no plain error in this case.[4]

**3.** We do not intend to imply that district courts may not in appropriate cases follow alternative procedures pursuant to Fed.R.Evid. 104 in order to determine the admissibility of evidence under Fed.R.Evid. 801 so long as a proper "preponderance" ruling is made.

**4.** We also reject appellant's argument that the district court erred in admitting "wholesale" the myriad statements of the conspirators.

The numerous statements were related to each other in a manner that indicates that a finding by the court that any of them were admissible under *Petrozziello* would imply that most if not all were admissible. If appellant felt that any particular statement should have been treated differently with regard to him, he should have specified any statements that he felt deserved separate treatment, or at least objected to the wholesale nature of the ruling.

## III. Pre-Indictment Delay

The prosecution introduced into evidence a tape recording of a conversation between McNiff and one Leo Power made by Power while acting as a government informant. The conversation took place one and a half years after McNiff first appeared with his lawyer before the grand jury and almost a year before he was indicted following several additional grand jury appearances. McNiff moved to suppress the tape recording on the grounds that it violated his Sixth Amendment right to the assistance of counsel because his lawyer was not present when it was made. He argued that the government delayed the securing of the indictment for the purpose of forestalling the triggering of his right to counsel until after the investigation was completed.

 Appellant's characterization of this argument as raising a Sixth Amendment issue is incorrect. As his argument itself implies, "it has been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him." *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972). The Sixth Amendment right to the assistance of counsel in "criminal prosecutions", U.S. Const. Amend. VI, is by definition not implicated by delays in commencing prosecutions. *Kirby v. Illinois, supra; United States v. Craig*, 573 F.2d 455, 475 (7th Cir. 1977) *cert. denied* 439 U.S. 820, 99 S.Ct. 82, 58 L.Ed.2d 110 (1978). Properly characterized, appellant's argument is instead a challenge on due process grounds to the legitimacy of prosecutorial delay in securing an indictment.

 Addressing this challenge on the merits, we find no violation of appellant's rights. The prosecution has wide discretion in deciding to delay the securing of an indictment in order to gather additional evidence against an individual. That discretion is limited only by the requirement that it not violate those "fundamental concep-

tions of justice which lie at the base of our civil and political institutions", *United States v. Lavasco*, 431 U.S. 783, 790, 97 S.Ct. 2044, 2049, 52 L.Ed.2d 752 (1977), *quoting Mooney v. Holohan*, 294 U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935); *see also United States v. Ramos Algarin*, 584 F.3d 562, 567 (1st Cir. 1978). Whenever a prosecutor using that discretion decides to delay asking for an indictment, an obvious and foreseeable result is the forestalling of myriad procedural safeguards intended for the protection of indictees, e. g. notice, speedy trial, or here, the right to the assistance of counsel. If it were clear that a prosecutor's decision to delay were motivated solely by a desire to turn such a result into a tactical advantage by impairing the ability of a defendant to mount an effective defense, a due process violation might be shown. *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 465, 30 L.Ed.2d 468 (1971). The instant case, however, by no means presents such a situation. The case was complex, involving numerous individuals and transactions. The evidence against McNiff at the time of the tape recorded conversation was by no means overwhelming, and the prosecution waited an additional year after the conversation to request the indictment. The prosecution presumably desired to indict all of the defendants at the same time, and thus had to wait until all the evidence was gathered against all the defendants. Given these facts, we need inquire no further in order to reject appellant's claim. To do otherwise, and scrutinize in detail the merits of the prosecution's decision, would "pressure prosecutors into resolving doubtful cases in favor of early— and possibly unwarranted—prosecutions", *United States v. Lovasco, supra*, 431 U.S. at 793, 97 S.Ct. at 2050, in order to avoid claims that any delay was unjustified.

## IV. Reference to the Witness Protection Program

 At the beginning of Power's direct testimony, the prosecutor asked him if the government had made any promises to

him in return for his testimony. He answered affirmatively, "that I would have to plead guilty to one offense of receiving fraudulent merchandise and that I also would be given a new Social Security number and subsistence and put on the witness protection program." Counsel for Ciampaglia, Woods, Canessa, Gintner, and Bancroft objected to this answer, not because it was false or incomplete (as is usually the case regarding disclosure of government promises to witnesses, *see e. g., United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976)), but rather because the reference to the "witness protection program" might have prejudiced the jurors by inducing them to think that Power was fearful of defendants. Counsel also contended that Power's statement was exacerbated by his entry into the courtroom in the company of two Deputy United States marshals, one of whom sat during Power's testimony by a door in the front of the courtroom through which the jury entered. The district court denied a motion for a mistrial, but offered to give a cautionary instruction to the jury. Counsel declined the offer, stating that they feared that such an instruction would draw too much attention to Power's statement.

While courts have stated that disclosure of a witness's participation in a witness protection program "is a matter that must be handled delicately", *United States v. Partin*, 552 F.2d 621, 645 (5th Cir.), *cert. denied*, 434 U.S. 903, 98 S.Ct. 298, 54 L.Ed.2d 189 (1977), appellants can point to no case in which such a disclosure was held to constitute cause for a mistrial. At least when not exploited by the prosecution, the possibility that such a disclosure might cause undue prejudice to defendants is, we think, generally minimal, as evidence by the often asserted and protected right of defendants to require disclosure of such deals, *see, e. g., United States v. Agurs, supra*. This is not to say, however, that within the context of a particular case such a disclosure might not constitute reversible error, especially if the prosecution were to exploit the prejudicial potential of the disclosure by encouraging the jury to draw certain infer-

ences. The dispositive factor is whether within the context of the entire case there is a reasonable likelihood of substantial, unwarranted prejudice.

In the instant case, Power's reference to the "witness protection program" was brief and isolated. No explanation of the meaning of the term or the criteria for participation in it was given to the jurors, who of course were lay persons. We recognize that, nevertheless, the mere use of the word "protection", together with the presence of the two marshals accompanying Power could conceivably have led at least some jurors to draw on their own the inference that Power was, with reason, fearful of defendants. This conceivable possibility is not however a reasonably likely one. Marshals were present in the courtroom at various times during the trial other than when Power testified. One of them sat in the bailiff's chair and at times ushered into the courtroom witnesses other than Power. It seems highly unlikely that the jurors both noticed that two marshals, rather than one, ushered in Power and inferred that this in conjunction with the isolated reference to the witness protection program meant that he was in need of protection from the defendants. It seems much more likely that the jurors interpreted the marshals' presence to be normal courtroom procedure, or instead perhaps inferred that Power, who testified with respect to his participation in a large number of crimes, was being guarded by the marshals in order that he not escape.

## V. *Prosecution's Withholding of Evidence That Might Have Impeached Its Own Witness*

██ Following Leo Power's testimony, counsel for each of the defendants proceeded in turn to attack vigorously his credibility. Collating the various points made, we find that it was shown that Power had committed perjury on several prior occasions, perpetrated mail fraud, broke and entered into buildings owned by defendants in order to steal a number of goods, and in general was a highly disreputable individu-

al. During this litany of attacks on Power, counsel for appellant McNiff also asked Power if he set the fire that burned down one of the Masterson storage buildings. Power said no. Counsel then asked him if he knew that both his ex-wife and McNiff accused him of having done so. Power answered yes.

At the conclusion of the trial, McNiff moved for a new trial, arguing that the prosecution should have objected when Power denied setting the fire, since it had been told by one Donald McHugh that Power admitted setting the fire. The district court denied the motion, pointing to the general immateriality of how the fire started, the fact that Power had consistently and repeatedly denied setting the fire when questioned by government agents who, the court found, believed him, the extrinsic nature of McHugh's statement, and the fact that McNiff himself knew of the accusation by McHugh even before the prosecution did.

Defense counsel subsequently discovered that the prosecution also had in its possession notes of a statement made by Karen Power, Power's ex-wife, which she had initialed and in which she described in detail the basis of her claim that Power set the fire. A renewed motion for a new trial was brought and it too was denied. The district court appropriately chided the prosecution for not coming forward with the notes at the hearing on the first motion, but found that the government's questionable behavior was not grounds for a new trial. The court based this finding on essentially the same grounds upon which its first decision was based, and in addition noted that once again defendants already knew from several sources of Karen Power's accusation and successfully established at trial that she had made it.

McNiff now appeals from the denial of his two motions, arguing that the district court selected the improper standard of materiality from among the three standards set forth in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), that it ignored the fact that the actual initialed notes, compiled well before the trial, would have been especially helpful in proving that Power set the fire, and that it was incorrect in characterizing the fire itself as "collateral". We find that we need not address all of these points, however, because we agree with the district court that the notes were immaterial, and in any event could not possibly have affected the judgment of the jury.

Appellant makes much of the fact that "the fire was a highly critical event linking [him] to the alleged conspiracy." This is true, because the fire focused the attention of the local authorities on the building and led to the discovery of what the receiver had supposed to be nonexistent records (which later disappeared). Thus, in that the fire ruined the attempts of the conspirators to hide the existence of additional Masterson records from the receiver, it was "highly critical". How the fire started, however, was in no way relevant to the prosecution's case; as the district court noted, no defendant was alleged to have started the fire, and the jury would not on its own have drawn such an inference from the manner in which the government's case was presented.

The only possible relevance of the manner in which the fire started, and hence the notes, was for limited impeachment purposes—the establishment of a prior "bad act" by a witness.[5] It is unlikely though that the notes could have been used at trial to prove that Power set the fire. Power denied setting the fire, and the district

---

**5.** Appellant McNiff suggests two other manners in which the evidence would have impeached Power's testimony: (1) proof that Power set the fire would have shown that he was "agitated" in the aftermath of the fire and thus unable to recall accurately the conversations that he had with McNiff at that time; and (2) proof that he set the fire would have shown the jury that Power was lying to them on that point and thus untrustworthy. The first point we find almost frivolous on its face, and in any event see no possibility that such a line of argument could have affected the judgment of the jury. The second point is factually more plausible; yet legally unsound in that acceptance of such reasoning would mandate mini-trials on collateral issues, contrary to Rule 608(b).

court could not have been required to conduct a "mini-trial" to see if he were telling the truth, Fed.R.Evid. 608(b).[6] Even if the court had conducted such a mini-trial, such a procedure could not have helped appellant. To the extent that Power's testimony could be discredited by demonstrations of prior bad acts, his admission to numerous other crimes and bad acts would have more than adequately sufficed. Our judgment in this respect finds support in the fact that defense counsel, armed with the knowledge that at least two individuals accused Power of setting the fire, chose not to pursue the matter any further than they did.

## VI. "Willful Blindness" Instruction

The trial judge instructed the jury in part on the issue of intent and state of mind as follows:

"'Knowledge' and 'willfulness' are mental conditions or a state of mind. Normally we cannot prove a state of mind for the obvious reasons that no witness is able to look inside a person's mind and find out or testify as to what he saw there. So you must judge a person's intent by what a person does or says or fails to do or fails to say.

What a man does is frequently more indicative of his true state of mind than what he says.

The element of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes to what would otherwise have been obvious to you. You may infer knowledge if you find beyond a reasonable doubt that the witness refused to be enlightened, refused to take notice.

Stated another way, a defendant's knowledge may be inferred from a willful blindness to the existence of the fact. It is entirely up to you as to whether you find any deliberate closing of the eyes and the inference to be drawn from any such evidence.

Any such evidence showing negligence or mistake is not enough to support a finding of willfulness or knowledge."

Appellants Gintner, Bancroft, and Ciampaglia objected to this charge, arguing that it "deprived the jury of its decision as to whether actions are more indicative of one's state of mind" and "shifted the burden to the defendants to disprove their actions."[7] They now argue that the instruction constitutes reversible error. We disagree.

The district court never instructed the jury that it had to draw an inference of intent from defendant's actions. Taken alone, the second paragraph of the instruction could possibly have been misread by a juror as mandating such an inference. Taken as a whole, however, see Cupp v. Naughten, 414 U.S. 141, 147, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973), the instructions on knowledge could not have been so read by a reasonable juror, compare Sandstrom v. Montana, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39. The trial judge repeatedly used the word "may" throughout the instruction, and explicitly stressed that the decision as to whether any inferences should be drawn "is entirely up to" the jury. The trial judge also instructed the jurors that the prosecution must prove "each and every element of the case or the charge beyond a reasonable doubt" and that the burden of proof "is always on the government" and "never shifts".

Appellants also contend that even if the instruction did not shift the burden of proof on any elements of the crimes charged, it was improper and prejudicial to give the "willful blindness" instruction in this particular case because "[t]here were no facts produced at trial which indicated that any of the defendants deliberately avoided knowledge of the scheme to defraud the creditors of Masterson." See United States v. Murrietta-Bejarano, 552 F.2d 1323 (9th Cir. 1977).

---

6. The district court indicated that it would not have conducted such a hearing.

7. The court in response to the objection gave a new instruction. In doing so, however, as appellant points out, the court merely paraphrased in less precise terms its first version.

The facts, however, at least as portrayed by appellants, were sufficient to justify the giving of this admittedly unusual charge. Appellant Gintner worked for Masterson on at least 30 occasions, filling out forms and answering the phone using false names and compiling fraudulent credit references. Appellant Bancroft worked at Masterson on a daily basis, also used a false name, and was observed removing records that were subsequently never found. He was also seen cutting Masterson labels off merchandise on the day that the search warrants were executed. Appellant Ciampaglia operated a company that served as the conduit for receiving and responding to requests for credit references. He dealt extensively with Masterson, purchasing large amounts of its merchandise at 40% of the wholesale price on a cash only basis. He was also seen attempting to disguise Masterson papers and merchandise by removing labels. All three individuals have defended themselves throughout by asserting that they were simply associated with Masterson and did not realize that they were assisting in the fraudulent schemes. The jury could have believed this assertion. However, it could also have thought that the facts indicated a pattern of behavior predicated upon a knowledge of the conspiracy together with a desire to limit inculpatory evidence of complicity, yet nevertheless participate in the scheme. Therefore, the giving of the "willful blindness" instruction in this particular case was not error.

## VII. Evidentiary Use of Bankruptcy Proofs of Claim

The prosecution introduced into evidence 700 proofs of claim, totaling 1.2 million dollars, that were filed against Masterson in bankruptcy court one-half year after the "business" commenced operation. The purpose of this evidence was to raise an inference that Masterson was run in a highly unusual manner and not as a normal, legitimate enterprise. Appellants objected,

asserting that the evidence was hearsay. This assertion would have been correct if the evidence had been introduced to prove how much Masterson actually owed its creditors (thereby raising the inference that it was not conducting business in good faith). However, as the district court correctly recognized, the proofs of claim were not hearsay for the purpose of establishing the fact the 700 claims totaling 1.2 million dollars were filed against Masterson within a half year after it commenced operations. This fact—the filing of an inordinate number and amount of claims in such a short time— also raised at least an inference that Masterson was not a typical, good faith business operation.[8] That the proper use of this evidence resulted in raising essentially the same inference that its improper use would have raised is by no means a sufficient reason to bar its admission.

## VIII. Denial of Severance Motion

Appellant Ciampaglia, who was not charged with conspiracy to conceal the property of the bankrupt (Count 2), asserts as error the trial court's denial of his motion for severance. We find no merit whatever to this assertion. Denial of Rule 14 motions will be reversed only upon a showing of abuse of discretion, *Sagansky v. United States,* 358 F.2d 195, 199–200 (1st Cir.), *cert. denied* 385 U.S. 816, 87 S.Ct. 36, 17 L.Ed.2d 55 (1966). Where all of the counts tried together are directly related to and part of the same overall scheme and transaction, and where separate trials would have necessarily involved repetitive use of most of the same evidence and same facts, we find no possibility of such an abuse absent a clear showing of substantial prejudice to the defendant. Given appellant Ciampaglia's involvement in the overall conspiracy, *see* Part VI, *supra,* and the fact that the evidence admitted against the other defendants which he claims prejudiced him was for the most part admissible against him under *Petrozziello, supra* Part II, (and was otherwise the object of limiting

---

8. As the statement of facts set forth in this opinion demonstrates, the proofs of claims were not the only evidence that raised such an inference.

instructions), we are not at all inclined to find that the trial court even approached an abuse of discretion.

\* \* \* \* \* \*

In conclusion, we find that the trial resulting in appellants' convictions was conducted fairly.[9]

*The judgments of the district court are affirmed.*

---

**9.** Appellant Woods has filed an eight page "Supplementary Brief" in which he raises *pro se* several points not argued by his counsel. We have examined these points and find them devoid of merit.