UNITED STATES of America, Appellee,

v.

Preston T. PATTERSON, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Benjamin DEMAGISTRIS, Defendant,
Appellant.

Nos. 80–1213, 80–1214.

United States Court of Appeals,
First Circuit.

Argued Nov. 6, 1980.

Decided March 9, 1981.

Rehearing and Rehearing En Banc
Denied April 15, 1981.

Joseph J. Balliro, Boston, Mass., for appellant Preston Patterson.

Morton Berger, Spring Valley, N. Y., for appellant Benjamin DeMagistris.

Paul E. Troy, Asst. U. S. Atty., Boston, Mass., with whom Edward F. Harrington, U. S. Atty., Boston, Mass., was on brief, for appellee.

Before CAMPBELL and BOWNES, Circuit Judges, and HOFFMAN,* Senior District Judge.

LEVIN H. CAMPBELL, Circuit Judge.

Benjamin DeMagistris and Preston Patterson appeal from their convictions on eleven counts of mail fraud, in violation of 18 U.S.C. §§ 1341 and 1342, and one count of conspiracy to commit mail fraud, in violation of 18 U.S.C. § 371.

Patterson maintained an office in Washington, D. C., where he acted as the exclusive agent of the Peerless Insurance Agency for issuing the performance bonds required in connection with bids by truckers seeking to be awarded contracts (Star Routes) for the transportation of mail. Peerless, according to testimony of a Postal Service employee, writes more such performance bonds than any of the few bonding companies in this field. DeMagistris was owner and president of Rodlac Trucking & Leasing Co., Inc., a postal route bidder and contractor. Patterson and DeMagistris were charged with having engaged in a fraudulent scheme whereby Patterson would leak the amounts of bids to DeMagistris, who would then submit a lower bid of his own and thus obtain the contract for his company.

I. *Sufficiency of the evidence*

Appellants contend the district court erred in denying their motion for acquittal on all counts because the Government failed to present evidence sufficient to sustain their convictions.[1] Appellants argue that

---

* Of the Eastern District of Virginia, sitting by designation.

1. The indictment charged 16 substantive counts, along with the one conspiracy count.

the Government failed to offer evidence that Patterson entered into any agreement with DeMagistris. Without such evidence, they argue, no conspiracy could be found; and the substantive counts must fall along with the conspiracy counts, since the scheme to defraud, as alleged in the indictment, depended upon an agreement between Patterson and DeMagistris.

In reviewing denial of a motion for judgment of acquittal, we consider the evidence as a whole, taken in the light most favorable to the Government, together with all legitimate inferences to be drawn therefrom, to determine whether a rational trier of fact could have found guilt beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789–2790, 61 L.Ed.2d 560 (1979); *United States v. Davis*, 623 F.2d 188, 195 (1st Cir. 1980); *United States v. Indelicato*, 611 F.2d 376, 384 (1st Cir. 1979); *United States v. Mora*, 598 F.2d 682, 683 (1st Cir. 1979). Where conspiracy is charged, the essential element to be proved is agreement. *Ingram v. United States*, 360 U.S. 672, 678, 79 S.Ct. 1314, 1319, 3 L.Ed.2d 1503 (1959); *Pereira v. United States*, 347 U.S. 1, 11, 74 S.Ct. 358, 364, 98 L.Ed. 435 (1954). A conspiratorial agreement may be proven by circumstantial as well as direct evidence, *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). The Government need not exclude "every reasonable hypothesis inconsistent with guilt" with respect to each piece of circumstantial evidence. Rather, "the question is merely whether the total evidence, including reasonable inferences, when put together is sufficient to warrant the jury to conclude that defendant is guilty beyond a reasonable doubt." *Dirring v. United States*, 328 F.2d 512, 515 (1st Cir. 1964). *See also Holland v. United States*, 348 U.S. 121, 139, 75 S.Ct. 127, 137, 99 L.Ed. 150 (1954).

In this case, both sides agree that the Government's strongest evidence of conspiracy between Patterson and DeMagistris, as well as of the substantive counts, was the testimony of Alex Mancone, particularly his account of statements made to him by defendant DeMagistris. Mancone, an employee and friend of DeMagistris who later became a competitor of DeMagistris in bidding for routes, recounted several conversations in which DeMagistris told him, directly or indirectly, that Patterson was supplying DeMagistris with bid information. Mancone testified to having been in a car with DeMagistris and overhearing the latter talk on a telephone with someone called "Pat," whom DeMagistris identified as Patterson. While talking, DeMagistris wrote figures on a clipboard. According to Mancone, DeMagistris "said the figures for the Queens run, he was writing down the figure so he could put a bid on it." Recounting a later conversation, Mancone testified that DeMagistris had said "that he was going to Washington, D.C. to Mr. Patterson's office. He would take the bid packages up there to get the prices—to get somebody else's prices, so he would be the lowest bidder and win the contract . . . . He would go down at the last minute. This way he could put the lowest bid in to get the contract." The substance of these conversations was reiterated and elaborated during cross-examination.

### A. Application of Rule 801(d)(2)(E)

DeMagistris's statements, as recounted by Mancone, were admissions and, as such, admissible against DeMagistris. Fed.R. Evid. 801(d)(2)(A). The same statements, however, could be used against Patterson only if in compliance with Fed.R.Evid. 801(d)(2)(E), which allows statements by a party's coconspirator made during the course and in furtherance of the conspiracy. Defendants contend that the standards applicable to such statements laid down in *United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977), were not met, and that the statements were therefore not admissible against Patterson. Defendants' arguments under *Petrozziello* are four: (1) that hearsay was admitted against both defendants before the *Petrozziello* standards were ad-

The district court granted defendants' motions for acquittal as to counts 3, 12, and 15, and the jury returned verdicts of not guilty on counts 4 and 9 and guilty on the remaining 11 counts.

dressed at all; (2) that the court erred in its finding that the existence of a conspiracy had been shown by a preponderance of the evidence; (3) that the court erred in making the *Petrozziello* findings during the Government's case, rather than at the end of all the evidence; and (4) that after the district court made the *Petrozziello* ruling, it implicitly revealed its finding to the jury, to the prejudice of the defendants.

### 1. Admission of hearsay before the *Petrozziello* findings

■ Defendant Patterson complains that on certain occasions the district court denied his requests for limiting instructions when witness Mancone testified to statements of DeMagistris, even though the court had yet to rule that the existence of a conspiracy, to which Patterson was linked, had been established as required in *Petrozziello*. Patterson cites as an example Mancone's account of DeMagistris's telephone conversation in the car, in which DeMagistris referred to the person on the other end of the line as "Pat." Patterson sought a limiting instruction, but the court denied the request, observing that "For whatever it is worth, the jury may have it." Later, however, the district court expressly made a ruling, and declared that the statements of DeMagistris could be considered as to Patterson. If this ruling was proper, a question we resolve in the affirmative, *see infra*, there was no lasting prejudice in the court's having allowed in the statements without initial limiting instructions. The subsequent ruling had the effect of validating the earlier admission, and no harm was done.

### 2. Correctness of the *Petrozziello* ruling

■ As *Petrozziello* explains, statements of co-conspirators are admissible under Fed. R.Evid. 801(d)(2)(E) only if the district court finds, on the basis of independent evidence, that "it is more likely than not that the declarant and the defendant were members of a conspiracy when the hearsay statement was made, and that the statement was in furtherance of the conspiracy." *Id.*, at 23. Here the district court stated, "I think the government has established the standard that it is more probable than not that a conspiracy existed and that the two defendants could well be found to be members of that conspiracy."[2] Defendants contend this finding was not supported by a preponderance of the evidence.

■ We must accept the district court's finding of fact in applying the *Petrozziello* test unless it is clearly erroneous. *See Campbell v. United States*, 373 U.S. 487, 493, 83 S.Ct. 1356, 1360, 10 L.Ed.2d 501 (1963) (clearly erroneous standard applied in review of district court's finding that a statement was adopted by a witness for purposes of the disclosure requirements of the Jencks Act); *United States v. Gypsum*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948) (clearly erroneous standard applied in review of district court's finding of no conspiracy in civil antitrust case); *United States v. Strahl*, 590 F.2d 10, 13 (1st Cir. 1978), *cert. denied*, 440 U.S. 918, 99 S.Ct. 1237, 59 L.Ed.2d 468 (1979) (clearly erroneous standard applied to district court's finding of fact on Jencks Act issue); *United States v. Botero*, 589 F.2d 430, 433 (9th Cir. 1978) (clearly erroneous standard applied to district court's finding of fact made after a suppression hearing); *United States v. Welp*, 469 F.2d 688 (9th Cir. 1972) (clearly erroneous standard applied to findings of fact after suppression hearing). *Cf.* Fed.R. Civ.P. 52(a) (clearly erroneous standard for review of district court's findings of fact in civil cases); 2 C. Wright, *Federal Practice & Procedure* § 374 at 18 (clearly erroneous standard for review of district court's find-

---

2. The court's use of the equivocal phrase, "could well be found," was incorrect and might be troublesome if there were any doubt as to the identity of the members of the conspiracy. However, the conspiracy here alleged involved only the two defendants; if, as the court found, there was a conspiracy, the two defendants had to be the members. The court's correct formulation of the standard shortly before this ruling confirms our belief that the "could well be found" language was a slip of the tongue, and that the court in fact found that the defendants were members of the conspiracy.

ings in jury-waived criminal trials). The district court cited generally the evidence that most impressed it: "the testimony of Mancone, Makris, and Vitti, the testimony concerning calls made in front of Mancone and the fact that Patterson and DeMagistris were seen together in Washington and the fact that one of the witnesses, and I believe it was Vitti, who testified that his solicitation was pulled from a pile of solicitations that were on the desk."

█ Mancone testified that he overheard DeMagistris talking on the phone to someone he called "Pat" while writing figures on a clipboard; and that after he had written protest letters to the Postal Service charging DeMagistris with obtaining contracts illegally, DeMagistris had offered to subcontract routes to him if he would withdraw the protests.

John Makris, another route contractor, testified that he prepared bids on six Connecticut routes in May 1978; that he lost all six, one to DeMagistris; that as to that latter route, Patterson had refused to bond his bid, claiming that Makris had underestimated the mileage; that DeMagistris's winning bid on that route was higher than Makris's would have been by some $3,000; that Makris later recalculated the mileage and found that he had not underestimated. Makris also testified that, in July 1978, he had prepared three bids; that Patterson had refused to bond two of them, claiming that they were too low; that Makris raised

one of the bids at Patterson's insistence; that DeMagistris then won the contract with a bid which was higher than Makris's original bid, and which had been bonded by Patterson after Makris had changed his bid; and that Makris had filed a protest.

Nicholas Vitti, also a route contractor, testified that on one occasion he travelled to Patterson's Washington office to sign a bid which he had inadvertently mailed unsigned; that he found DeMagistris sitting in Patterson's office with Patterson; that he saw piles of bid packages on Patterson's desk, from which Patterson removed Vitti's bid for his signature. Vitti also testified that, in July 1978, Patterson refused to bond a bid of Vitti's on the ground that it was too low. Patterson later agreed to bond the bid, which ultimately won over competition by DeMagistris, only after Vitti's son telephoned Patterson, pretending to be an accountant, and insisted that the bid was not too low.

Appellants argue that all of this testimony can be explained away consistent with the absence of any conspiracy. The judge, however, did not commit clear error in detecting more than coincidence in the coalescence of these events. Moreover, we think it appropriate to recognize, in the circumstances of this case, that after the court ruled, there was additional evidence corroborative of the existence of a conspiracy to which Patterson belonged.[3] We conclude

---

**3.** For example, John Lenart, another contractor, testified that he saw DeMagistris walking down the hall toward Patterson's office on May 30, 1978, a day when Patterson bonded DeMagistris's winning bid on a route for which Lenart had also bid; Postal Inspector Kevin McDonough testified to an interview with Patterson in which Patterson denied keeping bid information on his desk while DeMagistris was present, denied having long telephone conversations with DeMagistris but then retracted that statement when confronted with telephone records; and admitted that DeMagistris sometimes completed his bid forms at Patterson's office. Both Patterson himself and his secretary testified that Patterson had a practice of writing each bidder's name and price on the back of one bid solicitation and keeping it in a file cabinet near his desk. The Government's exhibits included telephone records indicating numerous calls, of between one and ten min-

utes, between Patterson's and DeMagistris's business and home phones, from February through July 1978. The Government also placed in evidence DeMagistris's bid bond applications for the 20 bids which he filed in 1978. On eight of these forms the signatures of witnesses were irregular; on one form, for example, his daughter-in-law had signed her maiden name, which she no longer used, and had given an incorrect address. Several of the forms indicate departures from Patterson's usual bonding procedures, in that they lack his usual notation that the bonding fee had been paid, or bear a "no money" notation. Of the forms for DeMagistris's seven successful bids, each of six bears a date indicating that it was the last bid bonded for the route. The bid forms, considered in connection with the testimony of the other bidders, also tend to show that DeMagistris had an unusually high rate of success in

there was an adequate basis for the finding that a conspiracy existed between Patterson and DeMagistris.

### 3. Timing of the *Petrozziello* ruling

■ The district court ruled on the *Petrozziello* issue before any evidence had been offered by defendants and indeed before the conclusion of the Government's case. Appellants now argue now that the court committed reversible error in not postponing its ruling until the conclusion of all the evidence. They made no such argument at trial, however. Rather, they argued the merits of the proposed ruling on the basis of evidence up to that point.[4] Nor did appellants later request a reconsideration of the ruling. Appellants rely on *United States v. Ciampaglia*, 628 F.2d 632, 638 (1st Cir., *cert. denied*, —— U.S. ——, 101 S.Ct. 365, 66 L.Ed.2d 221 (1980), which was decided after the trial below. We said in *Ciampaglia* that our adoption of the "more likely than not" test in *Petrozziello* "implicitly anticipated that the defendant's evidence would be taken into consideration." We therefore held that district courts should make the *Petrozziello* ruling at the end of all the evidence, although we recognized the contested evidence might be received provisionally until that time. In *Ciampaglia*, as here, the defendant did not object at trial to the timing of the ruling. Agreeing with the Eighth Circuit's decision in *United States v. Baykowski*, 615 F.2d 767 (8th Cir. 1980), we held that defendant's failure to object "bars an appellate [sic] from raising the point on appeal in the absence of plain error." As in *Ciampaglia*, we find no such plain error here.

■ Since the *Petrozziello* standards were sufficiently met, DeMagistris's out of

court statements could come in against both defendants and have been considered by us with the rest of the evidence for purposes of evaluating its sufficiency. After examining the record, and noting particularly Mancone's testimony and the evidence previously mentioned, we conclude there was sufficient evidence to find both defendants guilty beyond a reasonable doubt on both the conspiracy and the substantive counts. The district court did not err in denying appellants' motions for acquittal.

### 4. Instructions to the jury on the *Petrozziello* ruling

■ Appellants raise a further challenge to the court's application of Fed.R. Evid. 8012(d)(2)(E). This relates not to the admissibility of a co-conspirator's declarations, but to the prejudice said to arise when the court sought to retract certain limiting instructions, as follows:

"Members of the jury, you will recall that several times during the trial the court instructed you that certain testimony elicited from various witnesses could only be used against certain defendants, and limited to that unless it later developed a conspiracy was shown and then you could use those statements against anyone found to be a member of the conspiracy.

"I now indicate to you without indicating any weight that the court feels bears on the subject that all testimony in this case from any witness may be used by the jury against anyone found to be members of the conspiracy."

Before the instruction, counsel for DeMagistris had said to the court, "I don't think you should tell the jury anything other than the fact that at this stage of the

---

4. Earlier, counsel for Patterson did ask that the court "refrain from instructing the jury as far as *Petrozziello* is concerned until such time as we have been heard on our motions for directed verdict upon completion of the government's case." After the court made its ruling, counsel for Patterson requested that the court not prejudge at that time defendants' arguments on their anticipated motions for acquittal.

bidding for postal contracts, and that his winning bids tended to undercut the next highest bids by a particularly small margin. DeMagistris testified that he regularly traveled to Patterson's office to have his bids bonded in person, travelling by airplane and taxicab, despite the expense, and that he prepared cost sheets at Patterson's office without the benefit of any of his cost records.

proceedings they may consider—but not tell the jury what is in your honor's mind or what a question of law was." Shortly after the instruction, counsel reminded the court of his previous request and objected to the instruction as given. Counsel for the Government suggested that the court give a curative instruction, indicating to the jury that it had meant to suggest no opinion as to how the jury should rule on the conspiracy issue. Counsel for Patterson then indicated that he preferred not to "place undue emphasis on what the court has already said," and that "I think you can make it clear to the jury at the end of the case." Counsel for DeMagistris said he believed his client had been substantially prejudiced, but agreed to leave the matter to the final charge. No motion for a mistrial was made. The court said nothing further on the subject during the trial. In charging the jury at the conclusion of the case, however, the court instructed, and reiterated at great length, to the effect that a co-conspirator's declarations were to be considered against another defendant only if the jury first determined, by independent evidence, that a conspiracy existed and that the other defendant was a knowing and wilful participant in the conspiracy.

The court's mid-trial instruction purporting to remove earlier imposed limitations was unfortunately phrased insofar as it could have been taken to imply the court itself felt that a conspiracy existed. This particular implication was not strong, however; and when the prosecution suggested the court explain matters to the jury, defense counsel insisted that any clarification be left to the final charge. In the charge the court instructed the jury—unnecessarily as we said in *Petrozziello*, 548 F.2d at 22–23 —that it should determine for itself the admissibility of co-conspirator statements, even requiring that the conspiracy and membership therein be proven beyond a reasonable doubt before a statement be considered. As we said in *Petrozziello*, this added layer of factfinding is not needed "but it can seldom prejudice the defendant." *Id.* Here, beyond perhaps mystifying the jury, it certainly did no harm, and

arguably helped overcome any prejudice from the challenged remarks by reemphasizing that the determination of whether or not a conspiracy had ever existed was entirely in the hands of the jury. Defense counsels' failure to object, or to request additional instructions, indicated that nothing further was desired by way of a curative instruction to neutralize the court's earlier remarks.

While the statement in question was regrettable, we do not perceive any such prejudice as would require reversal, especially in the absence of either a motion for mistrial or objection to the final charge. The most defendants would have been entitled to was an adequate curative instruction making it plain the court had not meant to suggest there was in fact a conspiracy. Counsel preferred to postpone this, as they were justified in doing; and thereafter the court had no reason to assume that its handling of the issue in the charge was not to the satisfaction of all concerned. Given the opaqueness of the original remark, we do not find reversible error.

## II. *The Jury's Colloquy with the Court Clerk*

■ As the second day of jury deliberations was beginning, the court clerk entered the jury room to inform the jurors that one juror was ill. At that time, a juror asked the clerk "for the transcripts of the trial." The clerk responded "that they wouldn't be allowed." The conversation apparently ended there, and the clerk did not inform the court or counsel of the juror's request. Defense counsel informed the court by letter of this event as soon as they learned of it. The court held a hearing at which the clerk recounted the event. The court treated counsel's letter as a motion "to set aside the verdict of the jury" and denied the motion without giving reasons. (In an earlier colloquy with counsel, the judge would not characterize the incident as "from the court," apparently by way of emphasizing he had known nothing of it.) The court denied Patterson's motion for a new trial, again without stating reasons.

Defendants argue that this event warrants reversal on two grounds. First, citing *Parker v. Gladden*, 385 U.S. 363, 87 S.Ct. 468, 17 L.Ed.2d 420 (1966), they claim "presumptive prejudice" arising from improper communication with the jury, particularly by an "authority figure" such as the court clerk. In *Parker* a bailiff stated in the presence of some jurors, during deliberations, that the defendant was guilty. Here the clerk expressed no opinion at all about the merits of the case. *Parker* is inapposite.

Defendants claim secondly they were deprived of their right to be present at a stage of the trial, in violation of Fed.R. Crim.P. 43(a), relying on cases which hold that a judge's response to a jury's communication "tantamount to a request for further instructions" must be made in the presence of the defendant or his counsel. *Rogers v. United States*, 422 U.S. 35, 39, 95 S.Ct. 2091, 2094–2095, 45 L.Ed.2d 1 (1975); *see, e. g., Shields v. United States*, 273 U.S. 583, 47 S.Ct. 478, 71 L.Ed. 787 (1927). We need not decide whether the present request for transcripts is governed by these authorities involving requests for instructions. It was in any event error for the clerk himself to purport to rule on the request, this being a matter within the court's discretion to grant or deny. *United States v. Almonte*, 594 F.2d 261, 265 (1st Cir. 1979); *United States v. Pollak*, 474 F.2d 828, 832 (2d Cir. 1973). The clerk should either have transmitted the request to the judge or suggested to the juror that he send a message to the judge through whatever channels were available. The clerk's error, while not the fault of the judge personally, was nonetheless an error in the conduct of the trial which would have required reversal had it affected the defendants' substantial rights.

But we think the error was nonprejudicial. Only the testimony of one witness, Alex Mancone, had been transcribed by the time the juror conveyed his request to the clerk. As previously noted, Mancone was a key government witness whose testimony had been especially damaging to the defendants. Courts are usually hesitant to read just one witness's testimony to the jury for fear it will be overemphasized and will result in a failure to consider the evidence as a whole. *United States v. DePalma*, 414 F.2d 394, 396 (9th Cir. 1969). While appellants' counsel now insist they would have agreed to sending Mancone's testimony to the jury—because, they say, he was discredited on cross-examination—these assertions can hardly be considered disinterested nor do we find them easy to accept.[5] We have read Mancone's testimony and believe it improbable a judge would have provided the jury with a transcript of his testimony standing alone. The judge's denial of a new trial is of some significance in this regard, as the making of transcripts available to the jury, like reading testimony, is a question that "would ordinarily lie well within the trial judge's power and duty to run a trial under reasonable ground rules." *Pollak, supra*, 474 F.2d at 832. We do not find reversible error in the incident described.

### III. *The Prosecutor's comment to Mancone*

■ During cross-examination, defense counsel questioned Mancone about a statement he had given to the Postal Inspector, asking when Mancone had last discussed the statement with the prosecutor. Mancone responded "a couple of weeks ago or a week or so ago." On redirect, the prosecutor returned to the subject of his previous discussions with Mancone and asked "Is it fair to say that I did tell you that you did a good job?" Defense counsel objected to the question as an expression of the prosecutor's personal opinion on the credibility of the witness, and moved for a mistrial. A bench conference ensued, in which the prosecutor sought to explain that his intention

---

5. We note the inconsistency between this assertion and defendants' still strenuous efforts, addressed in Part I of this opinion, to exclude significant portions of Mancone's testimony. We also note that while the cross-examination was powerful, and struck vigorously at Mancone's credibility, Mancone never retreated from his testimony concerning DeMagistris's admissions—indeed, he reiterated it during cross-examination.

had been, for some reason, to remind the witness of a conversation the previous evening in which they had briefly touched on the statement, not to comment on the witness's credibility. The court denied the motion for mistrial and instructed the jury as follows:

> "The Court asks you at this time to disregard the last question of Mr. Troy and whatever the answer was, if there was any.
>
> "Whatever any counsel feels as to the importance of any witness' testimony is immaterial, irrelevant, and may be improper. It is your job and your job alone to determine the credibility of any witness, and also whether the witness is telling the truth or not, and what part you believe, all you believe or none you believe. No one else can do that but you."

In its final charge, the court again instructed the jury on their responsibility to judge the credibility of the witnesses and on the factors to be considered in that judgment.

Defendants now argue that the court erred in denying their motion for a mistrial. This court has repeatedly expressed its disapproval of a prosecutor expressing his personal views to a jury. *United States v. Gonzales Vargas*, 558 F.2d 631 (1st Cir. 1977); *United States v. Farnkoff*, 535 F.2d 661 (1st Cir. 1976); *United States v. Williams*, 496 F.2d 378 (1st Cir. 1974); *United States v. Cotter*, 425 F.2d 450 (1st Cir. 1970). The American Bar Association has codified the principle condemning such conduct in its Code of Professional Responsibility, DR 7–106(C)(4). But no one contended, even in the heat of the trial, that the prosecutor was acting in bad faith, although his reason for straying into the issue is obscure. And we see little or no prejudicial effect from the question. The most readily apparent import of the challenged comment is that the witness had borne up well from the Government's viewpoint. This was a tribute more to his gamesmanship than to his veracity. To the extent the jury might have interpreted the question as an endorsement of Mancone's veracity, the court's curative instruction was sufficient. We find no error in the denial of a mistrial.

## IV. *Testimony of Mancone and Gioffre*

Appellants object to two particular items of testimony, one by Mancone and one by Attorney Anthony Gioffre, which they claim should have been excluded.

### A. *Mancone*

While recounting a conversation with DeMagistris, Mancone was asked what his understanding was of an offer by DeMagistris to take Mancone to see Patterson. Mancone was allowed to state that he understood the offer to mean that the two would go to see Patterson and Patterson would give Mancone bid prices so that Mancone could get a route. The statement was admitted as indicating Mancone's state of mind. Appellants correctly argue that Mancone's state of mind was irrelevant; the jury was as capable of interpreting DeMagistris's declaration as was Mancone. But this testimony came after Mancone had testified on numerous occasions to conversations in which DeMagistris supposedly told him that he was receiving bid information from Patterson. This particular statement, in the course of an 18-day trial, added little or nothing to the impression already created, and was therefore harmless.

### B. *Gioffre*

Mancone had testified that, when he decided to bid against DeMagistris despite his suspicions, he had hired Attorney Anthony Gioffre to assist him in attempting to get his bid bonded fairly. Attorney Gioffre was later called as the Government's witness. He testified regarding a telephone call he had made to Patterson. When asked what Mancone had told him that prompted the call, he was allowed to testify, over the defendants' objection, that Mancone had told him "that he suspected there was collusion between Mr. Patterson and Mr. DeMagistris with respect to getting information concerning other bids." Defendants object to this statement as hearsay. The Government argues, and the district court held, that the testimony was admissible under Fed.R.Evid. 801(d)(1)(B), to refute an implied charge of recent fabri-

cation or improper influence or motive. We agree. Defendants undertook to impeach Mancone by suggesting that he was testifying out of self-interest and that his own conduct showed a lack of regard for the law. The jury could have thought it was being suggested that Mancone's testimony was recently fabricated or improperly influenced.

### V. *Patterson's motion for severance*

During his cross-examination of Mancone, Mr. Berger, attorney for DeMagistris, brought out the fact that Mancone had at one time worked for him as a private investigator. Counsel for Patterson then moved for severance, arguing that this fact was new to him, that he had learned also that the relationship had ended as a result of a dispute over Mancone's bills to Berger's clients, and that these facts would limit his opportunity to cross-examine Mancone. When asked precisely how he would be limited, counsel answered that he might wish to cross-examine Mancone about his dispute with Berger for the sake of impeaching Mancone's credibility, and that if he were to do so, and if Mancone were to respond falsely, counsel would be unable to call Berger to rebut Mancone's answers. The district court, unpersuaded that prejudice had been shown, denied the motion subject to renewal later in the trial. The motion was never renewed, and counsel for both defendants conducted extensive and vigorous cross-examination of Mancone.

■ Under Fed.R.Crim.P. 14, a district court may grant a severance where it appears that a defendant is prejudiced by joinder. A motion under Rule 14 is addressed to the discretion of the district court, and severance under that rule is appropriate only where a defendant makes a "strong showing of prejudice." *Gorin v.*

*United States*, 313 F.2d 641, 645–46 (1st Cir.), *cert. denied*, 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052 (1963). *See also United States v. Shuforth*, 454 F.2d 772, 775–76 (4th Cir. 1971) (severance mandated where "substantial degree of prejudice" springs from a joint trial).

■ In this case, counsel's assertion of prejudice was wholly speculative; if he were to ask certain questions of Mancone, and if he were to receive certain answers, he might then find himself prevented from calling a rebuttal witness. The relevance of the questions counsel assertedly wished to pose was tangential at best. In fact, counsel chose not to question Mancone on the subject, and counsel for both defendants found numerous other, more direct avenues to try to impeach Mancone's credibility.[6] Counsel's speculative assertions are insufficient to make the strong showing of prejudice necessary to establish that the district court abused its discretion in denying the motion for severance.[7]

### VI. *Exhibits*

■ Defendants' final argument on appeal relates to certain exhibits which the Government placed in evidence as business records. Two types of documents are in issue: (1) certain bids received by the Postal Service's bid opening committee; and (2) bid packages containing both winning and losing bids for the seven routes for which Rodlac was the low bidder. The business records exception to the hearsay rule is codified in Fed.R.Evid. 803(6). Under the rule, records kept in the course of regularly conducted business activity are admissible unless the circumstances indicate lack of trustworthiness. The determination of whether a foundation has been laid for application of this rule, and whether the cir-

---

6. *See* Part II, *supra.*

7. Patterson argues, citing *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), that he was prejudiced by a "conflict in attorney Berger's representation of the co-defendant DeMagistris." In *Glasser*, the court found prejudice to a defendant where the district court had appointed his counsel to represent a co-defendant as well, despite conflicting interests between the defendants. We see no analogy between that case and this one, in which each defendant had separate counsel of his own choosing, and neither defendant claims that his counsel had interests inconsistent with the defendant's own.

cumstances indicate untrustworthiness, is within the discretion of the district court. *United States v. Blake*, 488 F.2d 101 (5th Cir. 1973); *United States v. Middlebrooks*, 431 F.2d 299, 302 (5th Cir.), *cert. denied*, 400 U.S. 1009, 91 S.Ct. 569, 27 L.Ed.2d 622 (1970).

## A. *Bids*

■ The bids, stapled to envelopes in which they were supposed to have been mailed, were placed in evidence during the testimony of Gloria Ryan, Secretary to the Director of Financial Support for the Springfield Region of the Postal Service. Ms. Ryan testified that it was her job to open the mail, and that her practice was to check the bid solicitation number on the outside of the envelope, to stamp the date of receipt on the outside of each unopened bid envelope, and to place the envelopes in a safe, from which the bid opening committee would take them to be opened. With respect to each bid introduced, Ms. Ryan acknowledged her time stamp, showing that she had received the bid, and testified on the basis of the cancelled stamp on the envelope that the bid had arrived at her office by mail. On cross-examination, Ms. Ryan testified that she did not witness the opening of the bids, so that she did not know for a fact whether each bid was stapled to the envelope in which it had arrived or whether the envelopes and bids might have been mixed up.[8] She also indicated that bids are quite frequently delivered by hand. At the conclusion of Ms. Ryan's testimony, defense counsel moved to strike her testimony and the exhibits on the ground that the Government had failed to show that the bids were in fact stapled to the right envelopes, so that the postmarks on the envelopes were not probative of whether these particular bids had been mailed.[9]

The district court denied the motion, observing that "the proof is for the jury to consider."

The Government then called several other Postal Service officials who were involved in the bid opening process. Each witness testified to his or her part in the office's usual procedures, which were designed to ensure that each bid was stapled to the envelope in which it had arrived. None of the witnesses could recall actually having observed the opening and stapling of these particular bids, and one witness did indicate that departures from the usual procedures did occur on rare occasions. After the testimony of these witnesses, defendants renewed their motion to strike the exhibits. The court denied the motion, observing that it was "satisfied with the chain of custody."

Defendants argue that the Government failed to show that the bids, as introduced into evidence, were in the form in which they were regularly kept. Defendants also suggest that the circumstances of the handling of the bids and envelopes indicate untrustworthiness. The district court here concluded otherwise, and we find no abuse of discretion in its ruling. The testimony of the Postal Service employees, if believed, would establish that they conscientiously observed a regular practice of attaching each bid to its own envelope. Admittedly, errors occasionally were made; but defendants offered no evidence to suggest that these particular bids were the subjects of such rare errors, nor do they now suggest that such evidence exists. The fact that a regular practice is occasionally broken is not enough to avoid application of the business records rule; otherwise, the rule would be swallowed up by an exception for less-than-perfect business practices.

---

**8.** Each envelope introduced bore the return address of the Peerless Insurance Company rather than that of the particular contractor submitting the bid.

**9.** Defendants now argue that the importance of the envelopes was the stamp indicating the date on which each was received. They do not, however, suggest what significance the date

might have, and we can think of none. It appears to us from the record, and particularly from the defendants' arguments to the district court, that the envelopes were introduced to establish that the bids were mailed, and we consider appellants' argument with this purpose in mind.

### B. *Bid packages*

During its direct examination of William Moriarty, Manager of the Springfield Postal Service office, the Government introduced into evidence, without objection, the seven bid packages (or solicitation packages) for the seven solicitations on which Rodlac was low bidder. Moriarty explained that a bid package is a manilla envelope containing all the bids submitted for a particular route, and that the packages are kept in the ordinary course of business. It came out later that the usual procedure of the office was to place a winning bid, on which a contract had been awarded, in a separate contract file folder, rather than returning it to the bid package; thus, in the case of three of the seven bid packages, introduced by the Government, Rodlac's bids would not normally have been kept in the packages, since the routes had been awarded to Rodlac on the basis of those bids.[10] Moriarty explained that he had given the Government's inspectors "carte blanche to do what they wanted to do to conduct their investigation," with the understanding that whenever they removed a document from his records they would replace it with a copy, and that in the case of these three bid packages the Government had removed the winning bids from the contract files, replaced them with copies, and placed them in the bid packages. On the basis of this testimony, defense counsel moved to strike the exhibits on the ground that they were not introduced in the form in which they were kept in the ordinary course of business. The court denied the motion, instructing counsel not to comment in final argument "as to which records are in which files."[11]

Appellants contend that this ruling was prejudicial error because "the exhibits in question were selectively rearranged by the Government in a manner which served to support the Government's theory of the case." The Government concedes that it should have entered the three winning bids in their separate contract files, but argues that there was no prejudicial error because "whether three of the winning bids were ordinarily kept in a separate contract file had no bearing on the case." We agree. Defendants offer no hint of how the Postal Service's filing system might relate to the issues at stake in the case, or how this departure from the usual manner in which the documents were kept might affect their reliability for the purposes for which they were offered, nor do they suggest that the documents themselves were in any way altered or inaccurate. Any business record introduced in evidence is in a sense removed from the usual manner in which it is kept simply by being withdrawn from the files of the business and brought to court, but such a departure is insufficient to make the business records exception inapplicable. To exclude business records such as these, defendants would have to show that they were treated in some manner that departs materially from the way that such records were kept in the usual course of business. They have failed to do so here.

*Affirmed.*

---

**10.** The other four routes were under protest and therefore had not been awarded, so that the low bid would ordinarily be in the bid package.

**11.** The record does not clearly indicate to which counsel that instruction was directed. Counsel for both sides assert that it was directed at them.