UNITED STATES of America, Appellee,

v.

Patrick PERKINS, Defendant,
Appellant.

UNITED STATES of America, Appellee,

v.

Lois PERKINS, Defendant, Appellant.

Nos. 89-1726, 89-1729.

United States Court of Appeals,
First Circuit.

Heard Sept. 7, 1990.

Decided March 5, 1991.

As Amended on Denial of Rehearing
March 19, 1991.

Wendy Sibbison, Greenfield, Mass., by Appointment of the Court, for appellant Patrick Perkins.

John T. Burns, Boston, Mass., by Appointment of the Court, for appellant Lois Perkins.

R.J. Cinquegrana, Asst. U.S. Atty., with whom Wayne A. Budd, U.S. Atty., Boston, Mass., was on brief, for the U.S.

Before CAMPBELL and TORRUELLA, Circuit Judges, and CAFFREY,* Senior District Judge.

LEVIN H. CAMPBELL, Circuit Judge.

Patrick and Lois Perkins (husband and wife) appeal from their March 15, 1989 convictions, after a jury trial, for conspiracy and for possession with intent to distribute one kilogram of cocaine. The district court sentenced each of them to a mandatory minimum five year term, pursuant to 21 U.S.C. § 841. Patrick and Lois make various claims of error which we consider and ultimately reject.

## FACTS

The indictment charged that Patrick Perkins and his wife, Lois Perkins, conspired to sell a kilogram of cocaine to Drug Enforcement Administration (DEA) undercover agent Robert Allen on July 18, 1987. Both Patrick and Lois were tried together, and the following was brought out at their trial.

1. On June 30, 1987, under the direction of DEA special agent Robert Allen, a DEA informant named James Short met with Patrick Perkins in a bar in Boston. They discussed the sale of cocaine and marijuana. Short had known Patrick and his wife, Lois, in Florida since 1986.

2. On July 16, 1987, also in Boston, Short introduced Patrick Perkins to agent Allen, who was posing as an interested drug buyer. Allen and Perkins discussed possible cocaine transactions, ultimately agreeing that Allen would fly to Florida, where Patrick and Lois Perkins resided, to purchase cocaine from Patrick. The price would be $22,000. That day Patrick returned to Florida.

3. On July 17, 1987, Allen and Short flew to Florida. On the same day, Allen and Patrick met in Fort Lauderdale, Florida, at a bar across from the Perkinses'

apartment. Perkins told Allen that he had not yet arranged for the delivery of the kilo of cocaine to his apartment, and that Allen would have to come the next day, July 18, to obtain it.

4. On July 18, 1987, Allen and Short went to the Perkinses' apartment. Allen expected Patrick to be there to complete the transaction but instead, as they were approaching the apartment building, they saw Lois Perkins entering with a third person, who disappeared upstairs while Lois greeted Allen and Short at the first floor entry to the building. Lois told Allen "the guy" had arrived and was upstairs. Allen and Short then entered the Perkinses' second floor apartment with Lois. Allen asked, "Is the package here?" Lois replied, "Yes, it is ... The guy has it in the other room ... He does not want to be seen by you." She asked Allen if he had the money and Allen replied, "Yes, I do." He told her it was down in the car, and went to get it from the car. While Allen was outside, Lois asked Short to step out into the hallway for a moment and closed the door behind her. When they went back in, a package (later shown to contain about a kilo of cocaine) was on the kitchen table. Using a knife lent by Lois, Short opened the package, intending to test the cocaine. When Allen returned with a bag containing $22,000, he saw Short cutting into the cocaine. Lois told Allen that Short was testing the package. Short spilled some cocaine on the floor. Lois cleaned it up and became upset, saying, "this is the last time that a deal was going to be done in the apartment." Allen told her, "I'm sorry that Patty put you in this position where you had to handle the package." Allen gave Lois $22,000 in a stack of $100 bills, which was in the paper bag he had brought. Lois Perkins took the bag and looked into it. The stack of bills was about three inches tall and not wrapped in anything. Allen asked "Where's Patty?", and Lois replied, "Up in Boston."

5. After both left the apartment, agent Allen directed informant Short, wearing a recording device, to return to the Perkins-

---

* Of the District of Massachusetts, sitting by designation.

es' apartment. A recorded ten minute conversation between Short and Lois ensued in which, among other things, they talked, insofar as could be determined from the barely audible tape, about prices ranging between $15,000 and $19,000 for something. Short testified the references were to the prices of cocaine.

6. Six months before the trial, the government had furnished reports and other evidence to the defense showing that between July 16 and November 5, 1987, Patrick Perkins and agent Allen had been in regular contact, discussing two ongoing drug conspiracies. One was Perkins' agreement to provide Allen with additional cocaine and the other was a plan to import a large quantity of marijuana. At the outset of trial, the court refused to admit any of this evidence insofar as it bore on the marijuana conspiracy but indicated it would allow evidence of two other conversations involving Perkins post July 18. One of these was a taped telephone conversation on September 24, 1987, in which Allen and Patrick discussed the sale of additional cocaine. Reference was made to Patrick's bringing "up one of those items got from you before ... for that price that was quoted me before ... the Boston price." The second was a recorded conversation between Short and Perkins in which Patrick told Short that Allen, whom he had discovered was an agent, had asked Patrick (on November 5, 1987, see below) to become an informant. Patrick warned Short that he could be killed if he cooperated. These two conversations were admitted.

7. On November 5, 1987, Allen revealed his identity as a DEA agent to Patrick Perkins and asked him to cooperate with several other drug investigations. Allen drove Patrick Perkins to the DEA office in Boston and told him that his wife, Lois, was subject to immediate arrest in Florida. Patrick Perkins declined to become a cooperating informant. Both Lois and Patrick Perkins were subsequently arrested.

8. During the pendency of this appeal, on the prosecution's motion, the district court unsealed a submission from the government that had previously been presented to it *in camera* on March 6, 1989, the day the trial began. The submission revealed that James Short was an informant against DEA agent, Edward O'Brien, who, according to the submission, was the agent who "originally recruited Short as an informant in the Spring of 1987." It stated that O'Brien was under investigation and that Short had had a prior business relationship with O'Brien. Stating that O'Brien was not a witness to any events which were the subject of the indictment, and was now in Washington, D.C., the prosecution urged the court to seal and impound the submission, and not disclose it to the defense, in order not to compromise the internal affairs investigation against O'Brien. The court acquiesced, finding the information therein was collateral to any issue that could arise in the Perkinses' case. It reserved the right to alter its ruling if, during the trial, the information in the *in camera* submission "could become relevant or could be considered exculpatory." The submission is attached as an appendix to this opinion.

10. After the prosecution rested, Perkins called no witnesses, but Lois took the stand. She testified, in essence, that Short had telephoned her on the evening of July 17th to say that a friend of Short's would drop off a package for Short on the 18th. She said she gave the package to Allen on the 18th and took a package in return, but did not know that Short's package contained cocaine nor did she look into the bag Allen brought. Short said he would return and pick up the second bag and did so. She knew nothing of Patrick Perkins' dealings with Allen. She did not know Short's package contained cocaine until Short cut into it in the kitchen.

11. After a five day jury trial, both defendants were found guilty of conspiracy and of possession with intent to distribute cocaine. This appeal followed.

I. The Appeal of Patrick Perkins.

On appeal, Patrick Perkins claims reversible error on several grounds: 1) the information in the *in camera* submission contained valuable impeachment evidence

against Short, withholding of which violated the government's constitutional duty to provide exculpatory evidence under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); 2) nondisclosure of the *in camera* evidence, coupled with the court's refusal to permit Patrick's attorney to cross-examine Short concerning certain financial dealings and tax records, violated Patrick's Confrontation Clause rights; and 3) the court committed error in admitting into evidence the two recorded statements that Patrick Perkins had made after the termination of the conspiracy. We consider each of these contentions in turn.

### A. *Nondisclosure of In Camera Evidence.*

Patrick Perkins argues that the information contained in the *in camera* submission, revealing Short's relationship with DEA agent Edward O'Brien, was material and exculpatory. He says it could have been used to impeach Short, who was a key prosecution witness, and that its nondisclosure affected the outcome of the case adversely to Perkins.

There is no question Patrick made a timely request for all exculpatory evidence, including impeaching evidence. Prior to trial, he filed, and the magistrate judge allowed, his motion seeking exculpatory evidence, including,

> any evidence which may be used to impeach or discredit any witness which the government intends to call at the trial of the captioned matter, particularly but not exclusively, inconsistent statements of a witness or between witnesses, statements of bias or prejudice against the defendant by a witness or admissions of poor memory by a witness, or perjury.

Because of nondisclosure to the defense of the *in camera* evidence, Perkins claims that he was deprived of the opportunity to reveal to the jury the full extent of the government's hold over Short.

The standard by which to assess the withholding of impeaching evidence is set out in *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1987). *See United States v. Reyes*, 926 F.2d 96 (1st Cir.1991). *Bagley* followed the Supreme Court's decision in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, in which the Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment." In *Brady* the withheld evidence, a co-defendant's confession, went directly to the issue of the accused's punishment. In *Bagley*, however, the withheld evidence, as here, was solely useful to impeach a government witness's credibility.

In such circumstances, the *Bagley* court held,

> a constitutional error occurs, and the conviction must be reversed, only if the evidence is *material* in the sense that its suppression undermines confidence in the outcome of the trial.

473 U.S. at 678, 105 S.Ct. at 3381. (Emphasis supplied.) The Court went on to declare that withheld evidence would be material in that fundamental sense,

> only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome.

473 U.S. at 682, 105 S.Ct. at 3383.

 The question here, therefore, is whether there was a reasonable probability that, if the information in the *in camera* submission had been disclosed at the outset of trial, Perkins would have been acquitted. The answer, we think, is "No." The *in camera* evidence was of marginal materiality. It was, at best, cumulative of other, more powerful evidence revealed to the defense and used by it to impeach Short. Short himself, moreover, was but the lesser of two principal witnesses, both of whose testimony was otherwise bolstered by tapes, and by other evidence.

Perkins argues that the withheld information was relevant to show that Short had at least four ongoing motives to lie at the Perkinses' trial: 1) Short had become a DEA informant against his own DEA supervisor, agent O'Brien; 2) Short wanted to

curry favor with his supervisor, O'Brien, necessitating that he remain in O'Brien's good graces in order to continue to gather information about O'Brien to pass on to the DEA; he, therefore, had to testify—and even lie—in the Perkinses' trial; 3) at the time of the Perkinses' trial, Short believed that O'Brien owed him $25,000 as a result of the recent dissolution of their business partnership in the auto sales company—by testifying favorably to the government, he would facilitate an amicable and favorable settlement of this debt; and 4) Short had received death threats from O'Brien's brothers; the threats would motivate him to testify against Perkins so as to retain his government protected status. Patrick contends that each of the above four factors could have constituted reasons for Short to fabricate testimony in return for future prosecutorial favors. Hence, the government was mistaken when it represented to the court that none of the information in the submission was exculpatory or useful for impeachment; and the court erred in regarding it as "collateral."

The government properly called the O'Brien information to the court's attention at the beginning of the trial. The court decided to seal it, acquiescing in the government's request not to compromise the ongoing investigation of O'Brien. Before sealing, the court found that the material was "collateral" to any issue that could arise in the Perkins case. The court reserved the right to release the material if in the course of the trial it appeared that "it could become relevant or could be considered exculpatory." By not revealing the material during the trial, the court showed that it continued to believe it was neither relevant nor exculpatory.

■ A presiding judge's determination as to the materiality of new evidence will ordinarily be accorded deference. *United States v. Sanchez*, 917 F.2d 607, 618 (1st Cir.1990). Given, however, the unusual order of events as well as the implication of constitutional rights, we review the determination here with care.

Like the district court, we conclude that the facts of the Short/O'Brien relationship were too "collateral" to have had significant impeaching value. Regarding the first alleged basis to impeach, the impounded material would have added nothing to establish Short's informant status *per se*. That Short was a paid police informant in the Perkinses' and other cases was fully brought out through discovery provided by the government, through testimony by agent Allen, and through Short's own testimony on direct and cross-examination. The government disclosed that it had paid Short $23,680 in all the cases he had worked on, including, but not limited, to the present one. A breakdown of payments was provided. Short testified that the government paid certain of his travel and living expenses. Agent Allen testified that Short had also initially been promised a reward of some unspecified type. On cross-examination, Short conceded, "to presently cooperating with the DEA in cases that have nothing to do with this" and "for being paid for that." [1] It was also brought out that the government had agreed to relocate him "[f]rom the Massachusetts area to wherever he wants to go," and that he had previously been convicted twice of receiving stolen property and for falsifying an auto title. The government also agreed to relocate his business. While O'Brien had recruited Short in the spring of 1987, O'Brien was not a witness to any of the events brought out in the present case, most of which occurred in the summer of 1987. The *in camera* submission placed O'Brien in Washington, D.C., not Boston, when the trial began. Thus, while O'Brien may have had some supervisory position relevant to Short in the summer of 1987 when the events in question occurred, it can only be inferred that he no longer had

---

1. The facts here differ markedly from those in *United States v. Shaffer*, 789 F.2d 682 (9th Cir. 1986), relied upon by appellant, where the fact of an informant-witness's service in a related case was largely withheld, depriving the jury of knowledge of the full scope of the witness's cooperation with the government. The district court ordered a new trial because of the government's conduct, and the court of appeals affirmed. Here it was the district court itself which determined that further disclosure was not required.

such a role by the time of trial, as he was no longer then working out of Boston, the office from which the case was investigated and the venue of the trial. The Government reasonably stated in its appellate brief that O'Brien "in any case, was not Short's supervisor at that time." O'Brien was not, moreover, a witness or otherwise identified as a participant in relevant events. We conclude that if the *in camera* information had been revealed, and Perkins' counsel had sought to inquire into the details of Short's unrelated informing against O'Brien, the district court could, in its discretion, have cut off the line of questioning as simply too remote. Alternatively, had the court allowed such inquiry, it would not have affected the outcome of the case. O'Brien's relationship with the present case was not materially significant and the jury was well informed as to Short's informant status.

By the same token, we see nothing particular in Short's relations with O'Brien to suggest that Short would have wanted to convict Perkins so as to "curry favor" with O'Brien. Given that O'Brien had no connection with the Perkinses' trial and was, by then residing in Washington, we cannot see that Short's testimony in the Perkinses' case would have been a matter of concern to O'Brien. The obvious reason for Short to want to assist the government was that Short was being paid and helped by the government to inform in this and other cases. This was fully revealed. The particulars of Short's relationship with O'Brien provided nothing additional.

Similarly the existence of a $25,000 debt running from O'Brien to Short was immaterial to impeaching Short. There was no connection between the Perkinses' case and Short's personal dealings with O'Brien. We do not see how lying to convict Perkins would assist Short in collecting his debt from O'Brien. Short, indeed, was by the time of trial embarked on a course of informing *against* O'Brien—as against others. He had been threatened by O'Brien's

brothers, suggesting that O'Brien had already learned about Short's role.

Perkins' final point is that the *in camera* submission reveals death threats to Short from O'Brien's brothers. Threats of this nature, he claims, would suggest that Short needed the government's protection, hence, had further reason to do its bidding. Such evidence was, therefore, relevant to Short's credibility. However, it was brought out at trial that Perkins himself, in a phone call, had conveyed a death threat to Short if he cooperated with the government. Also brought out was the government's promise to relocate Short and his business. That a paid informer is in jeopardy from the criminal associates he informs against and their friends is obvious, and was certainly further suggested by the foregoing. The O'Brien death threat was, therefore, cumulative, adding only incrementally to the existing picture of Short as a man with compelling reasons to want to placate the government.

We conclude, therefore, that the materiality of the *in camera* evidence, except for the death threats, was remote, while the threats evidence was so cumulative as to be of only minor impeaching value.

The *in camera* material was not only weak in impeaching value, but it related solely to one of the government's two main witnesses. While both were central to the case, the government argues with some force that Short was a less important witness than agent Allen. It was Allen primarily who met with Perkins on July 16 and 17 and arranged with him the cocaine purchase. Accompanied by Short, Allen then met with Lois on July 18 in the Perkinses' apartment where the cocaine was purchased and paid for. Short, to be sure, went back alone to talk to Lois. He testified, damagingly to Lois, that their conversation then related to cocaine pricing—something not entirely clear from the tape. The defense points out other ways in which Short, especially, strengthened the government's case.[2] Still, we agree that Allen's

---

**2.** Perkins points out that while Allen described his conversation with Perkins on July 16 as pertaining to the purchase of a "package," Short

said specifically that it dealt with cocaine. Also, Short was briefly alone with Lois on July 18 when Allen went to get the money. From all

testimony was, overall, the more critical. The government's case was further buttressed, moreover, by several extremely incriminating tapes, surveillance testimony, and physical evidence—most notably the package of cocaine itself. Indeed, even Lois Perkins, who testified, did not deny that the transaction occurred, although she explained her own involvement as innocent and unknowing. Given that Short's status as a paid police informer was fully brought out, and given the marginality of the O'Brien material, we see no probability that if the *in camera* evidence had been revealed, the jury would have decided differently. We accordingly reject Perkins' contention that his conviction should be reversed because of the withholding of this supposedly exculpatory evidence.[3]

### B. *Refusal to Permit Cross-examination of Short about Finances.*

Perkins argues that the district court erred in refusing to permit his counsel to cross-examine Short concerning subpoenaed records indicating, *inter alia*, that Short had recently purchased a condominium for $205,000, signed two promissory notes for $100,000 and $56,000, and had filed no tax returns since 1985. Perkins further argues that the harm of these exclusions must be weighed along with the harm from the court's suppression of the O'Brien materials, *supra*. *In toto*, the court's exclusionary rulings are alleged to have violated the Confrontation Clause of the Sixth Amendment, by improperly limiting defendants' right to cross-examine Short and bring out the events and traits underlying his alleged bias against Perkins.

■ Defendants, of course, were constitutionally entitled to adequate leeway to impeach Short's credibility and motivation. *United States v. Tracey*, 675 F.2d 433, 437 (1st Cir.1982), citing *Davis v. Alaska*, 415 U.S. 308, 315–316, 94 S.Ct. 1105, 1109–10, 39 L.Ed.2d 347 (1974). *See also United States v. Lynn*, 856 F.2d 430, 432–433 (error to foreclose all cross-examination on a major relevant topic).

■ The district court, nevertheless, has wide discretion to impose reasonable limits on the scope of cross-examination. *Delaware v. Van Arsdall*, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986); *United States v. Twomey*, 806 F.2d 1136, 1139 (1st Cir.1986); *United States v. Keithan*, 751 F.2d 9, 11 (1st Cir.1984). We previously stated that,

> a trial court may limit cross-examination, but only after there has been permitted a certain threshold level of cross-examination that satisfies the constitutional requirement. If the jury has sufficient evidence bearing on the witness' bias, the court need not permit unending excursions into each and every matter touching upon veracity.

*United States v. Kepreos*, 759 F.2d 961, 965 (1st Cir.), *cert. denied*, 474 U.S. 901, 106 S.Ct. 227, 88 L.Ed.2d 227 (1985) (citations omitted). The jury must be allowed "to make a discriminating appraisal of the possible biases and motivations of the witnesses." *United States v. Frappier*, 807 F.2d 257, 261 (1st Cir.1986), *cert. denied*, 481 U.S. 1006, 107 S.Ct. 1629, 95 L.Ed.2d 203 (1987) (citing cases).

■ We think that standard was met here. For reasons already discussed in respect to Perkins' *Bagley* due process claim, most of the *in camera* materials were excludable in the court's discretion as remote and cumulative. Short's status as a paid informer, under government protection, in

---

the evidence pertaining to these occasions, however, we think the *special* value of Short's testimony on these occasions is somewhat overstated, although it was clearly useful to the government's case.

**3.** We see little force in Perkins' argument that nondisclosure of the *in camera* material was tantamount to withholding polygraph test results. *Cf. United States v. Lynn*, 856 F.2d 430, 431 (1st Cir.1988); *Carter v. Rafferty*, 826 F.2d 1299, 1309 (3d Cir.1987), *cert. denied*, 484 U.S.

1011, 108 S.Ct. 711, 98 L.Ed.2d 661 (1988). The *in camera* submission indicated that Short was given a polygraph test in connection with his activities against O'Brien. Allen testified that Short was not so tested as to his activities against Perkins. Perkins argues that Allen could have been impeached on the discrepancy. We think the whole business much too collateral to undermine "confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678, 105 S.Ct. at 3381.

this and other cases was fully spelled out from other sources. And even assuming it was error not to have revealed the O'Brien brothers' threats, these were so cumulative of other evidence indicating Short's need for government protection (and the government's hold over him in other ways) that nondisclosure was harmless beyond a reasonable doubt. *Delaware v. Van Arsdall,* 475 U.S. at 684, 106 S.Ct. at 1438.

With respect to Short's condominium purchase, signature of promissory notes, and nonfiling of income tax returns, Perkins' counsel wanted to delve into these under Fed.R.Evid. 608(b), as bearing upon Short's credibility.[4] Counsel stated: "I question his ability to pay for that [the condominium and notes]." She suggested to the court that whether or not Short paid went to his truthfulness and credibility. The need for him to explain his [nonpayment of] taxes from 1985 on was also urged. The court, however, refused to allow these lines of questioning.

We cannot say the court abused its discretion. The jury had been informed that Short had been convicted for receiving stolen goods on two separate occasions and, on a later occasion, with falsifying a title. He was asked whether he had ever cheated other people and, upon his denying this, was cross-examined about an automobile sale, nonpayment of an attorney and failure to pay for a boat. Lois later testified to his poor reputation for truthfulness. Adding all this to the extensive evidence of Short's role as a paid government informant, *supra,* we believe the jury was able to make "a discriminating appraisal" of Short's "possible biases and motivations." *Frappier,* 807 F.2d at 261.

We hold the court's rulings did not violate the Confrontation Clause.

C. *Whether the Court Erred in Admitting Perkins' Post-conspiracy Statements.*

■ A tape recording was admitted into evidence of a September 24, 1987, conversa-

tion between agent Allen, still acting undercover, and Patrick Perkins. In the course of this, Allen said,

> Well look, if you want to combine something and bring up one of those items I got from you before ... I can always ... get rid of it for you ... One or two of them at least ... You know, for that price that was quoted to me before ... The Boston price.

Perkins responded, "Right," and told Allen to call him on Sunday. In agreeing to allow the tape to be played, the court commented that the conversation "would appear to corroborate that an episode took place." From the court's remark, we infer it found Perkins' response to be an admission corroborating Perkins' earlier participation in the July 16th conversation with Allen—a conversation that mentioned a certain price for cocaine in Boston. We see no abuse of discretion in admitting the tape on this theory. While the tape may have been prejudicial because of references to other drug dealing, the jury could have found it probative of Perkins' involvement in the charged conspiracy. *See United States v. Currier,* 836 F.2d 11, 17 (1st Cir.1987).

A lengthy conversation recorded on November 18, 1987, between Short and Perkins was also admitted. The government offered it as "consciousness of guilt evidence" against Patrick Perkins. In allowing it, the court said, "it's the same situation"—apparently meaning it was like the September 24 tape discussed above. In the November 18th conversation, Perkins related to Short how Allen had revealed himself to Perkins as a DEA agent on November 5, 1987; had taken Perkins to the DEA office; had sought to compel his cooperation; and had threatened to arrest his wife. Perkins told Short that if Short cooperated with the DEA, he would probably last a year, and then, "someone would kill you."

---

4. Rule 608(b) provides, in part,
 Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility ... may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness ... concerning the witness' character for truthfulness or untruthfulness.

■ Defense counsel's principal objection to the tape was that it revealed Perkins' talks with agent Allen on November 5, 1987 at the DEA office—evidence to which Allen himself allegedly could not testify directly because of the custodial nature of the interview. In the tape, however, it was Perkins himself who described the November 5 encounter. That it might have been error to allow agent Allen to testify to the interview was irrelevant. Perkins' taped remarks were independently admissible as they were probative of Perkins' involvement in the charged conspiracy, reflecting both his complicity with Short and his consciousness of guilt. *See United States v. DeLuna,* 763 F.2d 897, 917 (8th Cir.), *cert. denied, Thomas v. United States,* 474 U.S. 980, 106 S.Ct. 382, 88 L.Ed.2d 336 (1985). In addition, we agree with the government that the admissibility of the tape renders academic any question of whether the court erred in allowing Allen himself to reveal, in his own trial testimony, a few aspects of the November 5, 1987, meeting. *See United States v. Benavente–Gomez,* 921 F.2d 378, 386 (1st Cir. 1990) (improper admission of evidence is harmless error where substantially the same evidence had properly been placed before the jury at an earlier time).

## II. The Appeal of Lois Perkins.

Lois Perkins, who was tried jointly with Patrick, maintains that the district court judge should have granted her request to sever her case from her husband's; that there was insufficient evidence to convict her; that the court improperly allowed Patrick's statements to be used against her; and that the court's instructions were erroneous.

### A. *Severance.*

Lois Perkins made a timely, but unsuccessful motion to sever her case from her husband's. On appeal she argues that her case should have been severed for three reasons: because Patrick Perkins would testify in a separate trial in her defense, because of prejudicial spillover of evidence at the joint trial, and because the co-defendants were married at the time of the trial.

■ There were obvious reasons of economy to try the Perkinses jointly, where they were charged substantively and as co-conspirators in the identical cocaine sale. Fed.R.Crim.P. 8(b). Most of the evidence against each was identical. Co-conspirators are customarily tried together absent a strong showing of prejudice. *See e.g., Patriarca v. United States,* 402 F.2d 314, 317 n. 2 (1st Cir.1968), *cert. denied,* 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969).

Under Fed.R.Crim.P. 14,

> If it appears that a defendant is prejudiced by a joinder of ... defendants ... for trial together, the court may ... grant a severance of defendants or provide whatever other relief justice requires.

It is settled that a motion to sever under Fed.R.Crim.P. 14 is addressed to the district court's discretion, *Opper v. United States,* 348 U.S. 84, 94–95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954); *United States v. Davis,* 623 F.2d 188, 194 (1st Cir.1980) (review of denial is solely for abuse of discretion). Otherwise, it has been said that denial of a severance motion will be reversed only upon the appellant's maintenance of the heavy burden of showing substantial prejudice as a result of joint trial, amounting to a miscarriage of justice. *United States v. Alemany Rivera,* 781 F.2d 229, 238 (1st Cir.1985), *cert. denied,* 475 U.S. 1086, 106 S.Ct. 1469, 89 L.Ed.2d 725 (1986); *United States v. Bautista,* 731 F.2d 97, 99–100 (1st Cir.1984); *United States v. Arruda,* 715 F.2d 671, 679 (1st Cir.1983).

■ Lois Perkins claims, first, that there was prejudice because her husband would have testified in a separate trial had the case been severed, and that his testimony could have exculpated her. This claim is undercut, however, by the paucity of any showing that Patrick's testimony would actually exculpate her. The district court was given nothing beyond Lois' counsel's conclusory assertion that Patrick's testimony would exculpate her. No particulars were provided as to what Patrick—who had not been present at the apartment when

the transaction occurred—could have said in Lois' defense. Nor did Patrick himself state his willingness to testify. We have held that denial of a motion for severance will be reversed only on a strong showing that the testimony of a co-defendant will be actually available and exculpatory. *United States v. Houghton*, 554 F.2d 1219 (1st Cir.), *cert. denied*, 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 120 (1977). In *Houghton* we stated that,

> [m]otions for a severance so that a defendant may be able to call a codefendant to the stand are usually denied. The courts show a healthy, and quite justified skepticism whether the defendant would call his codefendant if he could, and whether the codefendant would not claim his constitutional privilege even in a separate trial.

554 F.2d at 1222 (citations omitted). Moreover, "it is not reversible error to deny severance requested on the ground that a defendant wants to call a co-defendant as a witness, unless the defendant shows the co-defendant is likely to testify at a separate trial and the testimony would exculpate him [or her]." *United States v. De Luna*, 763 F.2d 897, 920 (listing cases). The court in *De Luna* cited the strong public policy favoring joint trials where permissible, stating, "[t]he defendant must show that the co-defendant's testimony would do more than merely tend to contradict a few details of the government's case against [him or her]." *De Luna* at 920 (listing cases). The *De Luna* court further noted that the proffered evidence would have been subject to substantial impeachment, as certainly seems likely here, given the strength of the evidence against Patrick.

Here it is entirely speculative what Patrick Perkins could possibly say to exculpate Lois. If the testimony of Allen and Short is believed, Lois' own comments and conduct strongly indicated her knowing participation in the sale of the cocaine on July 18. She was first seen in the presence of "the guy," who presumably brought the package of cocaine; she later explained to Allen and Short he did not want to be seen; she requested payment for the package; she

accepted and looked into the bag stacked with $100 bills; she later spoke to Short about cocaine prices; she said this was the last deal in her apartment. Since Patrick was not at the apartment, he could not have disputed the foregoing. Presumably he could deny his own dealings on July 16 and 17, but in so doing he would be met with the government's very strong evidence on that score. Without any advance indication of something more promising, we cannot say the district court was obliged to sever in order make it more possible to secure Patrick's testimony.

Lois argues, second, that highly prejudicial spillover resulted to her from evidence used against her husband. By "spillover" she presumably refers to a situation where evidence establishing the guilt of one defendant, but not admissable against the other, may create an atmosphere clouding the jury's ability to evaluate fairly the guilt or innocence of the latter. Thus, "[t]he prime consideration in assessing the prejudicial effect of a joint trial is whether the court may reasonably expect the jury to collate and appraise the independent evidence against each defendant...." *United States v. Sherlock*, 865 F.2d 1069, 1079 (9th Cir.1989).

Here we see no significant spillover problem. The evidence of Patrick's conversations with Allen and Short on July 16 and 17 was admissible not only against Patrick but also against Lois, once it could be inferred, from evidence of the events in the apartment on July 18, that Lois and Patrick were involved in the same conspiracy to sell the kilo of cocaine. While Patrick's taped conversations on September 24 and November 18 occurred after the conspiracy and were not admissible against Lois, they did not directly inculpate her and did not prevent the jury from fairly evaluating the evidence against her, which stood or fell on the events of July 18, 1987.

The district court expressly cautioned the jury to deal with each defendant individually. The jury was told that, "the fact that the two defendants have been charged together in one indictment does not change your responsibility to examine the case

against each of the defendants and to determine the guilt or innocence of each of the defendants on an individual basis." We have no reason to believe that the jury was unable to give, or did not give, individualized attention to Lois' case. *See United States v. Alemany Rivera*, 781 F.2d 229.

Lois claims, finally, that the two co-defendants were married and that severance would have avoided the problems inherent in a husband-wife prosecution where the conspiracy partnership can be confused with the marriage relationship. We see nothing in this argument. This is not a joint trial where the married status created special evidentiary problems. *Compare New Jersey v. White*, 195 N.J.Super. 457, 480 A.2d 230, 232 (1984). The Tenth Circuit has said in a similar family situation: "[F]rom a review of the record we must conclude that even if the trials had been severed ... the independent evidence against each one of them was and would have been sufficient for conviction...." *United States v. Carter*, 613 F.2d 256, 260 (10th Cir.1979), *cert. denied*, 449 U.S. 822, 101 S.Ct. 81, 66 L.Ed.2d 24 (1980). Lois, out of the presence of Patrick, delivered the cocaine and received the payment for it. If Allen's and Short's testimony is accepted, she did so in circumstances and with comments which demonstrated her knowing participation in a cocaine sale earlier arranged by Patrick with Allen. She herself testified to a different version, indicating that the package had been left by a friend of Short's, and that its contents were unknown to her. It was up to the jury which version to believe. Either way, her marriage with Patrick was not a factor, nor was Patrick even present when the transaction involving Lois occurred.

### B. *Sufficiency of the Evidence.*

 Lois Perkins argues that there was insufficient evidence for the jury to find her guilty of conspiracy to violate the narcotic laws or of aiding and abetting such violation. A challenge of this nature requires that we view the evidence "in the light most favorable to the government, drawing all legitimate inferences and resolving all credibility determinations in fa-

vor of the verdict." *United States v. Angiulo*, 897 F.2d 1169, 1197 (1st Cir.), *cert. denied, Granito v. United States*, —— U.S. ——, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990) and *cert. denied*, —— U.S. ——, 111 S.Ct. 130, 112 L.Ed.2d 98 (1990), as cited in *United States v. Gomez Pabon, et al.*, 911 F.2d 847 (1st Cir.1990), *cert. denied, Guzman v. United States*, —— U.S. ——, 111 S.Ct. 801, 112 L.Ed.2d 862 (1991). The verdict must be upheld if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 852 (listing cases).

In *Gomez Pabon* we stated that,

[t]o prove the elements of the crime of conspiracy, the government must show the existence of a conspiracy, the defendant's knowledge of the conspiracy and the defendant's voluntary participation in the conspiracy. More specifically, to establish that a defendant belonged to and participated in a conspiracy, the government must prove two kinds of intent: "intent to agree and intent to commit the substantive offense." Such proof may consist of circumstantial evidence, including inferences from surrounding circumstances, such as acts committed by the defendant that furthered the conspiracy's purposes. The government need not prove that a co-conspirator knew all of the details or participated in all of the objectives of the plan.

911 F.2d at 852 (citations omitted).

The government presented evidence that Lois Perkins delivered the package containing approximately a kilo of cocaine to undercover agent Allen. This was the amount previously arranged with Patrick, who had earlier directed Allen to the apartment on the date and time in question for just such a transaction. Lois told Short and Allen "the guy" had arrived. Allen asked if the package was here, and Lois replied, "Yes." Lois kept Short out of the room until the package of cocaine was delivered, after earlier telling the two men that the "guy" did not want to be seen by them. Lois asked Allen if he had the money and he went to get it. When Short cut into the package, Lois explained to Allen he

was testing the package. Allen gave Lois a bag with $22,000 in visible $100 bills; she looked into it, and kept the bag full of money. The sum was exactly as Allen had previously agreed with Patrick, in Boston. When Short engaged Lois in a conversation a few hours after, they discussed the price of cocaine. Clearly the evidence was ample for a reasonable jury to infer that Lois had knowingly conspired with Patrick to sell the cocaine, as well as to find that Lois had knowingly possessed the cocaine with intent to distribute it.

### C. *Admission of Co-conspirator Statements.*

■ Lois argues that the district court did not observe proper procedures in admitting evidence of her husband's statements against her. She is correct in the one respect that, contrary to our ruling in *United States v. Ciampaglia*, 628 F.2d 632 (1st Cir.), *cert. denied*, 449 U.S. 956, 101 S.Ct. 365, 66 L.Ed.2d 221 (1980), and *cert. denied, Bancroft v. United States*, 449 U.S. 1038, 101 S.Ct. 618, 66 L.Ed.2d 501 (1980), the district court did not make an express *Petrozziello* determination *at the close of all evidence.* 628 F.2d at 638. We held in *Ciampaglia* that in finding a conspiracy "by a preponderance of the evidence," as required, the court should take into consideration the defendant's evidence; and that to assure the doing of this, the court should make its final ruling at the close of all the evidence, out of the presence of the jury. *Id.* We also held in *Ciampaglia*, however, that the defendant's failure to object to the omission of such an express trial-end determination bars him from raising the point on appeal in the absence of plain error. *Id.* As in *Ciampaglia*, we do not find plain error here. The district court initially instructed the jury that Allen's testimony concerning Patrick's conversations was admissable only against Patrick. After, however, Allen related what occurred with Lois at the apartment, on July 18, the court stated,

> there is enough to substantiate a conspiracy. I'm informing you now that all these conversations that have been ad-

mitted thus far are admitted against both parties.

The court should later, under *Ciampaglia*, have made a determinative ruling, by a preponderance of the evidence, of conspiracy and of defendants' participation therein. Absent objection, however, we infer the court made such a ruling *sub silentio.*

Lois Perkins also claims that in admitting her husband's statements against her, the court violated "the spousal testimony privilege." She further asserts a violation of *Bruton v. United States*, 391 U.S. 123, 137, 88 S.Ct. 1620, 1628–29, 20 L.Ed.2d 476 (1968). We are at a loss, however, to see how either the spousal privilege or *Bruton* is implicated. The evidence of Patrick's conversations setting up a "buy" were without significant reference to Lois. They clearly did not reveal Lois' interspousal remarks nor was this a situation in any way resembling that in *Bruton.*

### D. *Instructional Errors.*

■ Lois also urges us to find error in the court's omission from its instructions of a "mere presence" charge. As to a "mere presence" instruction, counsel timely objected to its absence immediately following the charge, although he did not explain precisely what was desired beyond using the "mere presence" catchword. Failure to give a requested jury instruction is reversible error only if:

> the [requested] instruction (1) is substantially correct; (2) was not substantially covered in the charge given to the jury; and (3) concerns an important point in the trial so that the failure to give it seriously impaired the defendant's ability to effectively present a given defense.

*United States v. Newton*, 891 F.2d 944, 949 (1st Cir.1989) (citing cases). We agree with the government that a conventional "mere presence" instruction would not have been "substantially correct" in the circumstances of this case since Lois Perkins' defense was not that she was "merely present." "Mere presence" implies not just an absence of criminal intent but passivity and nonparticipation in the actual

commission of the crime. Here Lois conceded to playing an active role in the transfer of the cocaine, but said she did so unwittingly and without prior knowledge that a drug was involved. The court's instructions sufficed to cover Lois' actual defense—which was simply her purported lack of knowledge, until too late, that cocaine was involved, and her lack of criminal intent. The court's instructions on the elements of each offense were comprehensive and clear. They made it clear that to find Lois guilty of conspiracy and of possession with intent to distribute, the jury had to find that she had the guilty knowledge and criminal intent requisite for each type of offense. The court clarified, that "an act is knowingly done ... if it's done voluntarily and intentionally, and not because of mistake, accident or other innocent reasons." Had the jury accepted Lois' version of her participation, namely that she was the mere innocent and unwitting recipient, on Short's behalf, of a package Short ordered, containing unknown contents; that she did not look into the package with the money; and that she did not make the incriminating remarks ascribed to her by Allen and Short, it would not have been authorized to convict under the instructions given.

We have considered defendants' further contentions concerning the court's instructions and concerning other alleged errors, and find them all to be without merit.

*Affirmed.*

APPENDIX

United States District Court

District of Massachusetts

United States of America

v.

Patrick Perkins and Lois Perkins

Criminal No. 87–393–T

GOVERNMENT'S IN CAMERA SUBMISSION

This submission is made *ex parte, in camera,* to advise the Court of information received by the government for the first time last week. The government requests that this submission be *sealed and impounded,* and incorporated in the record of this case, but that it *not be disclosed* to defense counsel.

FACTS

On February 27, 1989, the undersigned learned for the first time that a death threat had been communicated to James Short, who is the confidential informant in this case. On July 16, 1987, it was Short who introduced Special Agent Robert Allen of the Drug Enforcement Administration ("DEA") to the defendant Patrick Perkins. Short will be a witness at trial. Short stated that the threat was communicated to him by one or more brothers of DEA Special Agent Edward O'Brien ("O'Brien"), who originally recruited Short as an informant in the spring of 1987. Agent O'Brien is not a witness to any of the events which are the subject of this indictment. The government will not call O'Brien as a witness at trial, nor has the defense requested that the government make O'Brien available. O'Brien is presently assigned to duty in Washington, D.C.

On February 27, the undersigned learned that O'Brien presently is the subject of an internal affairs investigation by DEA ("the investigation"), and that the investigation pertains, *inter alia,* to O'Brien's association with one or more persons to whom the threat against Short was attributed by O'Brien's brother(s). Short is cooperating with the internal affairs investigation of O'Brien. He has been given a polygraph test, which he passed, in connection with that investigation.

On March 2, 1989, Short was subpoenaed, in my presence, by defense counsel. The subpoena called for the production of certain business records by Short (a copy of the subpoena is attached hereto). I advised Short to consult with his attorney regarding production of the records requested. Short told me that he was, for a time, in the automobile sales business with Agent O'Brien. The business was called O'B Two, Inc., d/b/a Bay View Auto Sales, in Buzzard's Bay, Mass., incorporated in June of 1988. O'Brien was the incorpo-

rator and a director, Short was the President, and O'Brien's brothers Paul and Eugene were officers and directors. The corporation was dissolved, and the dealership sold, about one month ago. Short informed me that some of the records called for by the subpoena might be in the custody of DEA, in connection with the internal affairs investigation referred to above.

On March 2, 1989 I interviewed DEA agents Brian Noon and Gerald Chapman, who are participating in the internal affairs investigation, for the sole purpose of determining whether they had any of the records called for by the defense subpoena. They told me that the investigation does pertain to the business relationship between Short and O'Brien. They also told me they have copies of a financial statement and certain cancelled checks related to the business, but no original records.

On Friday, March 3, 1989, I reviewed with Special Agent Allen (who is the case agent in the Perkins case and the government's principal witness at trial) his knowledge of the status of the internal affairs investigation against O'Brien. Allen confirmed that, to his knowledge, the allegations against O'Brien include O'Brien's business relationship with Short. Allen told me that this business relationship began in the spring of 1988, after all of the events which are the subject of this trial had occurred, and after the date of this indictment (December 28, 1987).

Short told me on March 3 that there is a dispute between Short and O'Brien regarding settlement of the dissolution of the corporation. Short believes he is owed about $25,000.

The internal affairs investigation against O'Brien also include a possible attempt by O'Brien to extort money from a defendant under state indictment (in an unrelated case), in return for O'Brien's promise to assist that defendant to avoid incarceration. Both Short and another informant have reported this allegation to DEA.

The DEA internal affairs investigation is being conducted by Agent Art Carter, of DEA Internal Affairs in Washington, D.C.

REQUEST

The information set forth above is not relevant to the events of July 16 to 18, 1987 which are the subject of this indictment. The business relationship between James Short and Agent O'Brien was not formed until after the defendants were indicted. The existence of this relationship between O'Brien and Short does not imply misconduct by Short. Nothing contained herein is exculpatory, nor does it tend to impeach Agent Allen or Short.

Moreover, disclosure of this information would compromise the internal affairs investigation against O'Brien. For these reasons, therefore, the government requests that the Court seal and impound this document and refrain from disclosing this information to the defense in this case.

Respectfully submitted,
JEREMIAH T. O'SULLIVAN
United States Attorney
By: R.J. Cinquegrana
R.J. CINQUEGRANA
Assistant U.S. Attorney

Dated: March 6, 1989