United States Court of Appeals
 For the First Circuit 

No. 95-1889
 UNITED STATES OF AMERICA,
 Appellee,

 v.
 CHARLES ROGERS, JR.

 Defendant, Appellant.

 
No. 96-2032
 UNITED STATES OF AMERICA,

 Appellee,
 v.

 ANDREW J. BEAGAN,
 Defendant, Appellant.
 

 APPEALS FROM THE UNITED STATES DISTRICT COURT
 FOR THE DISTRICT OF RHODE ISLAND

 [Hon. Francis J. Boyle, Senior U.S. District Judge] 
 
 Before

 Selya and Lynch, Circuit Judges, 
 and Pollak, Senior District Judge.*  

Robert D. Watt, with whom Frederick Q. Watt and Brian J. Sylvia 
were on brief, for appellant Charles Rogers, Jr.
Mark J. Gardner for appellant Andrew J. Beagan. 
Stephanie S. Browne, Assistant U.S. Attorney, with whom Sheldon 
Whitehouse, U.S. Attorney, was on brief, for appellee. 
 

 August 26, 1997
 

  

*Of the Eastern District of Pennsylvania, sitting by designation.

 LYNCH, Circuit Judge. A sting operation involving LYNCH, Circuit Judge. 

cocaine led to the arrests and convictions of Charles Rogers

and Andrew Beagan. They, along with two others, were charged

with conspiracy to distribute and to possess with intent to

distribute over five kilograms of cocaine in violation of 21

U.S.C. 846, and attempt to distribute and to possess with

intent to distribute over five kilograms of cocaine in

violation of 21 U.S.C. 841(a)(1). Rogers and Beagan both

raise numerous challenges to their convictions. The most

substantial of these is Rogers' sufficiency of the evidence

claim. Beagan's claims revolve around his defense of

entrapment. We affirm.

 I.

 During the Fall of 1994, members of the Providence

Police Department met with Ronald Rego, an informer, to

discuss a drug sting. Agreement was reached that Rego would

receive 10% from a drug sting. In return, Rego would

arrange a meeting between Detective Fred Rocha and Andrew

Beagan, a codefendant here. Detective Rocha would arrange a

cocaine sale to Beagan and arrest him at the time of the

sale.

 On November 16, 1994, Rego introduced Rocha to

Beagan. The meeting was tape recorded. Rocha claimed he was

a large-scale cocaine dealer and Beagan indicated he was

interested in buying as much as 25 kilograms. Other

 -2- 2

telephone conversations and meetings took place in early

December. Some of these were recorded. Rocha and Beagan

agreed on a December 12 sale date.

 Beagan and Rocha met on that day. Beagan told

Rocha that "his people" did not want to carry all their money

at once, so Beagan and Rocha agreed they would split the

transaction into two parts. Rocha would first deliver 10

kilograms of cocaine and Beagan would pay. If Beagan's

people liked the quality, then the remaining 15 kilograms

would be exchanged.

 Beagan and Rocha worked out the details of the

exchange on the telephone. Rocha was to call Beagan later

that day to tell him where to bring the "drop car" in which

the cocaine was to be loaded. Rocha would then pick up the

drop car, load it with 10 kilograms of cocaine and drive the

car to an undisclosed location. Beagan would meet Rocha at a

third location to show Rocha the money for the 10 kilograms.

Once Rocha saw the money, he would tell Beagan where he had

left the drop car. Beagan's people would pick up the drop

car, and, if they were satisfied with the cocaine, Beagan

would release the money to Rocha. If Beagan's people wanted

to buy the remaining 15 kilograms, they would have to do so

within the hour.

 As planned, Beagan called Rocha to tell him that

the drop car, a white Taurus, was in the University Heights

 -3- 3

parking lot in Providence. Rocha and another police officer

picked up the car, which had been rented by David Scialo (the

third codefendant in the case). The rental agreement listed

Rogers as the second driver.

 The police officers loaded into the car 25

kilograms of oatmeal packaged to look like cocaine. They

moved the car to the parking lot of a ball field in

Providence. Rocha called Beagan and told him to bring the

money to the India Point Days Inn in Providence. Beagan

arrived at the motel parking lot around 4 p.m., accompanied

by the final codefendant in the case, Ruben DeLeon. DeLeon

was carrying a black bag. Rocha saw that the bag contained

bundles of money.

 Beagan handed Rocha a cellular telephone (which

belonged to Scialo) so that Rocha could tell Beagan's

confederate at the other end of the line where the drugs

were. However, the line went dead. Beagan plugged the

telephone into an outlet in his car and the telephone soon

rang. Beagan handed the phone to Rocha, who told the caller

that the drop car was parked at the ball field parking lot at

Power Street in Providence. Rocha then returned the

telephone to Beagan, who remained on the line until he was

arrested.

 Officers who were stationed near the ball field saw

a green Toyota pull up next to the drop car. Rogers was

 -4- 4

driving; Scialo and one other were passengers. The car was

rented to Scialo. Scialo got out of the Toyota, into the

drop car and began to drive away, following Rogers. Two

officers saw that Rogers was holding a cellular phone to his

ear. The authorities stopped the two cars and arrested

Rogers and Scialo.1

 Soon afterwards, FBI agents and Providence police

arrested Beagan and DeLeon at the Days Inn. Telephone

records established that around 4 p.m.(the approximate time

that Rocha spoke to Beagan's confederate on the telephone and

told him where to find the drop car), the telephone Rogers

was holding was used to twice call the telephone Beagan was

holding.

Procedural History 

 The four codefendants -- Rogers, Beagan, Scialo and

DeLeon -- were charged and tried before a jury on the two

drug trafficking counts. At the close of the government's

case, Rogers moved for a judgment of acquittal as well as for

a mistrial based on an allegedly improper statement by the

prosecutor in his opening. The prosecutor had said that he

would show that Rocha had spoken on the telephone to someone

named Chuck during the drug deal. No such evidence was

admitted at trial. The district court denied the motions,

  

1. They also arrested the other passenger in the car, Juan
Toribio, but he later was released.

 -5- 5

stating that defense counsel could argue in closing that the

government had failed to produce promised evidence.

 After beginning deliberations, the jury requested

that the court instruct them once again on the meaning of

predisposition. The court did so. Beagan objected to the

instruction, asking that the jurors be told that in

considering whether he was predisposed to commit the charged

crimes, they might only consider his behavior prior to his

contact with the government agents. The court declined to

give the additional instruction. The jury returned to its

deliberations, and Beagan, Rogers and DeLeon2 were convicted

on the two drug trafficking charges. Scialo was acquitted.

 Beagan and Rogers moved for a new trial, each on

different grounds. Rogers argued that the verdict was

against the weight of the evidence and that there was newly

discovered evidence, in the form of Scialo's testimony, which

would exculpate Rogers. The district court ruled against

him.

 Beagan moved for a new trial on several grounds,

only one of which warrants discussion: his claim of juror

misconduct. Beagan filed an affidavit from Matthew Beagan,

Jr., his brother, alleging that after the trial, Matthew

Beagan had spoken to one of the jurors, who stated that the

  

2. DeLeon has petitioned for habeas relief, claiming that
his attorney failed to file and perfect his appeal.

 -6- 6

jury had been very confused about the meaning of the term

"predisposition" and that some of the jurors had consulted

dictionaries. The court called in the juror to whom Matthew

Beagan had spoken, as well as one other juror, and questioned

them regarding their post-trial contact with Matthew Beagan

and the use of dictionaries by jurors. The questioning took

place in the presence of counsel for all the parties in

interest. After meticulous inquiry, the court denied

Beagan's motion for a new trial. It found that although

there had been juror misconduct in that at least one juror

had consulted a dictionary on the term predisposition, the

conduct was not prejudicial to Beagan because it occurred

prior to the time the jurors requested additional legal

instruction on the legal definition of the term.

 Rogers was sentenced to 78 months' imprisonment.

Beagan was subject to a statutory minimum of 240 months'

imprisonment.

 II.

Rogers 

 Rogers' primary claim is that there was

insufficient evidence to convict him on the two drug

trafficking counts. He argues that he was merely present at

the scene of the crime and that there is no evidence of his

actual involvement.

 -7- 7

 The case against Rogers is admittedly

circumstantial and requires some inferences. We review the

facts in the light most favorable to the verdict. United 

States v. Montas, 41 F.3d 775, 778 (1st Cir. 1994). Seen in 

this light, the evidence is sufficient to support Rogers'

convictions on both counts.

 It is true, as Rogers argues, that mere presence at

the scene of a crime is insufficient to establish guilt.

However, this court has distinguished between "mere" presence

and "culpable" presence. A defendant's presence during the

commission of a crime can establish guilt where the

surrounding circumstances imply participation. United States 

v. Montilla-Rivera, 115 F.3d 1060, 1064 (1st Cir. 1997); 

United States v. Paulino, 13 F.3d 20, 25 (1st Cir. 1994); 

United States v. Ortiz, 966 F.2d 707, 711-12 (1st Cir. 1992). 

Such is the case here.

 It was Rogers who drove Scialo to the baseball

field to pick up the drop car and who was listed as the

second driver in the rental agreement. Most significantly,

it was Rogers who was observed talking on a cellular phone in

the middle of the drug deal. Records place his call to the

cellular phone Beagan was using. Rogers was not merely

present, he was talking on a cellular telephone with one of

the conspirators while the deal was in progress. A jury

could reasonably find that Rogers was discussing the cocaine

 -8- 8

sale, was a knowing participant in the drug conspiracy, see 

United States v. Piper, 35 F.3d 611, 615 (1st Cir. 1994) 

(defining conspiracy), and knowingly attempted to possess

cocaine with the intent to distribute it, see Paulino, 13 

F.3d at 25.3

 Rogers' claim that he should be granted a new trial

because his conviction was inconsistent with Scialo's

acquittal also fails. Rogers' argument essentially is that

there was more evidence of Scialo's involvement in the

conspiracy than of his own, and that the jury's acquittal of

Scialo shows that there was insufficient evidence to convict

Rogers. To the extent that Rogers has preserved this claim,

it is without merit.

 A not guilty verdict against one co-conspirator is

not the equivalent of a finding that the evidence was

insufficient to sustain the conspiracy conviction of a second

co-conspirator. United States v. Bucuvalas, 909 F.2d 593, 

595-97 (1st Cir. 1990). If the reviewing court finds the

evidence was sufficient to support the verdict against the

convicted defendant, the conviction must stand despite the

co-conspirator's acquittal. Id. The evidence was 

sufficient.

  

3. Rogers' citation to United States v. Thomas, 114 F.3d 403 
(3d Cir. 1997), provides him no comfort. Thomas is 
distinguishable on its facts: unlike this case, it did not
involve telephone calls between the defendant and a known
conspirator while a drug deal was in progress.

 -9- 9

 Rogers also argues that the district court erred in

denying his motion for a mistrial based on the prosecutor's

opening statement. The prosecutor referred to someone

identified as Chuck as being on the telephone receiving

instructions from Rocha at the time of the drug deal (Rogers'

given name is Charles). When the prosecutor attempted to

elicit testimony from Rocha concerning that conversation, the

court ruled the evidence inadmissible. Rogers argues that,

given the importance of whether he spoke on the telephone

with Rocha and Beagan during the drug deal, the court should

have granted a mistrial. We disagree.

 Rocha appropriately has not claimed the

prosecutor's reference during his opening statement was made

in bad faith to mislead the jury. In closing, defense

counsel argued that there was no evidence linking Rogers to

the telephone call during the drug deal. And the district

court charged the jury that statements by counsel argument

are not evidence. The district court did not err in denying

the motion for a mistrial. See United States v. D'Alora, 585 

F.2d 16, 21 (1st Cir. 1978) ("[A] defendant is not entitled

to two trials, one before the judge to filter out

inadmissible evidence and then a jury trial to determine

guilt or innocence.")

 Nor did the court abuse its discretion in refusing

to grant Rogers' motion for a severance. Such motions are

 -10- 10

only to be granted where the defendant makes out a strong

showing of prejudice; a defendant is not entitled to

severance merely because he may have a better chance of

acquittal if tried separately. Zafiro v. United States, 506 

U.S. 534, 540 (1993). A district court's decision to deny a

motion for severance is accorded significant deference.

United States v. O'Bryant, 998 F.2d 21, 25 (1st Cir. 1993). 

 Rogers has not presented any reason why this case

is different from most drug conspiracy cases with multiple

defendants involved in the conspiracy to differing degrees,

and co-conspirators generally are tried together. United 

States v. Perkins, 926 F.2d 1271, 1280 (1st Cir. 1991). 

Contrary to Rogers' claim, his defense and Beagan's were not

antagonistic, merely different. Beagan argued that he was

entrapped, Rogers that he was merely present at the crime

scene. These two theories of the case are not necessarily

inconsistent. The district court scrupulously instructed the

jurors that they must consider the evidence as to each charge

and each defendant separately. The court did not abuse its

discretion in refusing to sever.

Beagan 

 Beagan's sole defense at trial and focus on appeal4

  

4. Beagan's only unrelated argument is that a new trial is
warranted because the district court never instructed the
jury to ignore a drug rally outside the courthouse. This
issue has been waived. Beagan's counsel requested that the
court recess until the drug rally was over, and the court

 -11- 11

was that he was entrapped. Beagan first argues that the

district court's instruction on entrapment was legally

incorrect. Specifically, he argues that the district court

should have instructed the jury that the government was

required to prove his predisposition to commit the charged

crime based on evidence that predated his contact with the

government. This is not a correct statement of the law. It

is true that, when a defendant raises a defense of

entrapment, the government must show that he was predisposed

to commit the charged crime prior to his contact with

government agents; however, the government may use the

defendant's behavior after he was approached by government

agents as evidence of his predisposition prior to meeting the

agents. See, e.g., United States v. Acosta, 67 F.3d 334, 339 

(1st Cir. 1995).

 Beagan next argues that he is entitled to a new

trial because jurors impermissibly used extrinsic material (a

dictionary) to understand the meaning of the term

"predisposition." Where, as here, a defendant makes a

colorable claim of juror misconduct, the district court must

  

agreed. No request was made at the time for a specific
curative instruction. Beagan cannot now claim he is entitled
to a new trial because he did not receive such an
instruction. United States v. Coady, 809 F.2d 119, 123 (1st 
Cir. 1987). Furthermore, the court repeatedly reminded the
jury to refrain from considering anything heard outside the
courtroom, which likely made a specific curative instruction
unnecessary.

 -12- 12

determine whether any misconduct has occurred and if so,

whether it was prejudicial. United States v. Boylan, 898 

F.2d 230, 258 (1st Cir. 1990). We review the district

court's refusal to grant a new trial for abuse of discretion.

Id. at 262; see also United States v. Cheyenne, 855 F.2d 566, 

568 (8th Cir. 1988) (giving "substantial weight to the trial

court's appraisal of the prejudicial effects of extraneous

information on the jury, since the trial judge has the

advantages of close observation of the jurors and familiarity

with the issues at trial").

 Here, Judge Boyle acted carefully and

conscientiously in response to the allegations of juror

misconduct. The court questioned the two jurors most closely

involved. It determined that although at least one juror had

referred to a dictionary to determine the definition of

predisposition, this occurred before the jury as a whole

sought additional instruction on the legal definition from

the court. The court concluded that whatever use was made of

the dictionary, the jurors had been unsatisfied that they

understood the legal import of the term predisposition and

had properly turned to the court for further instruction.

The court concluded that any misconduct had not been

prejudicial because of the court's additional instruction on

the legal meaning of predisposition.

 -13- 13

 There was no abuse of discretion. To the extent

that the jurors' consulting the dictionary was misconduct,5

we agree with the district court that any potential harm to

the defendant was cured by the subsequent legal instructions

on predisposition.

 Beagan's final claim is that he was denied

effective assistance of counsel at trial. Trial counsel

introduced evidence concerning Beagan's character, opening

the door to evidence of Beagan's 1991 drug conviction and

thereby, according to Beagan, totally undercutting the

entrapment defense. In accordance with our usual practice,

we will not consider a claim made for the first time on

direct appeal. See, e.g., United States v. Springer, 28 F.3d 

236, 239 (1st Cir. 1994); United States v. Mala, 7 F.3d 1058, 

1063 (1st Cir. 1993). Determining whether assistance of

counsel was constitutionally deficient is a fact-bound

inquiry that would require us to go beyond the record on

appeal and consider such matters as trial counsel's strategy.

See Springer, 28 F.3d at 239; Mala, 7 F.3d at 1063. 

 Affirmed. 

  

5. Courts that have considered the issue of juror dictionary
use have not generally considered such use to be prejudicial
per se. See, e.g., United States v. Turner, 936 F.2d 221, 
226-27 (6th Cir. 1991); United States v. Cheyenne, 855 F.2d 
566, 567-68 (8th Cir. 1988). This circuit has not yet passed
on the issue of whether a juror's dictionary use even
constitutes misconduct, and we have no need to do so here.

 -14- 14